**Leslie J. EDWARDS, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 79A02–9903–CR–214.

Court of Appeals of Indiana.

July 7, 2000.

See also 724 N.E.2d 616.

Brian G. Dekker, O'Brien & Dekker, Lafayette, Indiana, Attorney for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, J.T. Whitehead, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

## OPINION

FRIEDLANDER, Judge

Leslie Edwards appeals his conviction for Exploitation of an Endangered Adult,[1] a class A misdemeanor. Edwards presents three restated issues for our review:

1. Did the trial court err by allowing into evidence checks written on the account of Marian Harris?

2. Is the evidence sufficient to support Edwards's conviction?

3. Did the jury render inconsistent verdicts by finding Edwards guilty of exploitation of an endangered adult and not guilty of theft?

We affirm.

The evidence reveals that Edwards and his wife Pamela moved into the home of Marian Harris. Harris, an octogenarian, was in ill health. Harris, a relative of Pamela's,[2] raised Pamela and Pamela's sister after their father was killed in Vietnam and their mother abandoned them. Harris lived in the same home from childhood through adulthood. After approximately one year, Edwards and Pamela moved from Harris's home, leaving her alone. When Edwards's relatives and local social services providers became suspicious of Edwards and Pamela's dealings with regard to Harris's property, an investigation ensued.

The evidence at trial disclosed that in July 1996, Harris was referred to Judy Davis. Davis was a money manager/coordinator for Area IV Agency on Aging and Community Services (Area IV Agency), a not-for-profit social service agency that assists in special services for "frail, elderly, physically and mentally disabled" clients. *Record* at 202. Harris was referred to Davis by Kim Baunach, a social service coordinator for a local hospital. At that time, Harris had glaucoma and "could see very, very little." *Record* at 209. Documents had to be read to Harris because she could not read the print. Harris was also an insulin-dependent diabetic, and had recently suffered a mild stroke. Harris's family physician for thirty years testified that by March 1996, he had informed Pamela that Harris should be referred to Area IV Agency because she was unable to properly administer her daily insulin shots.

Davis met with Harris regarding Harris's bank statement. Davis believed that irregularities existed. Without objection at trial, Davis testified that she discovered $988 in checks to a local grocery in one 26–day period. On the back of each check was a notation that $25 in cash was obtained. The bank statement was for the month prior to Davis and Baunach's meeting with Harris. Davis and Baunach dis-

---

1. Ind.Code Ann. § 35–46–1–12 (West 1998).

2. Harris is also related to Edwards.

covered that Harris had "seven boxes of cereal, a few can goods, very little in the refrigerator, ... and was in need of groceries at that time." *Record* at 204. Because Harris told Davis that she had not signed all of the checks, Davis and Baunach reported the information to Adult Protective Services (APS).

As Davis was leaving Harris's home, Edwards and Pamela were in the yard and inquired about Davis's meeting with Harris. Davis explained that she was concerned about the checks. Pamela stated that Harris was her mother and that she suspected that her sister had written the checks. Edwards and Pamela told Davis that they had been living with Harris for a period of time, but that they no longer lived with her.

Later that evening, Davis received a telephone call from Pamela. Pamela admitted that she had written some of the checks. Pamela asked about the consequences. Pamela also noted that she assisted Harris at times by cooking, helping around the house, and grocery shopping. Davis had a representative payee appointed for Harris's social security payments and obtained assistance for Harris with regard to her financial matters.

Davis and Baunach continued to investigate. Harris told them that although she owned her home, she "had to sign some papers" regarding the house. *Record* at 209. Davis enlisted the help of an attorney at Legal Services who found that, as of July 1996, all of the documents for the house still listed Harris as the owner. Davis met with Edwards, Pamela, and Harris at Harris's home. Davis described the meeting:

> Mrs. Harris was very emphatic about the house was hers, so I called the two together to talk to them because there was suspicion that something had happened with the house, we just couldn't

pin point (sic) what had happened, we just didn't know. They told her, actually Leslie Edwards said to her, you told us you wanted us to have the house, and she said I do when I die, it is still my house. And he made a remark about you knew what you were signing when you signed it, and I just kind of looked at him, and she I don't think really, because he kind of mumbled this a little bit. And then we went on to discuss the repercussions of selling the house if she had to go in a nursing home. He told her that they wanted to sell the house, wanted to sell the house in order to take care of her, that the money would be used to take care of her. And I explained to him that if the house was sold within a three year period of going to a nursing home that that could jeopardize her from her being on Medicaid, and that there could be a lot of problems concerning that.

*Record* at 211. In August, Davis discovered that there was a deed for the house to Edwards and Pamela, and that the house had been sold. None of the proceeds were deposited into Harris's accounts that Davis administered under the Indiana State Money Management Program.

The Realtor who purchased the home from Edwards and Pamela noted that, after satisfying a mortgage on the property and paying two small claims court judgments against Edwards and Pamela, he gave Edwards and Pamela $13,163.55. Under the terms of the agreement to sell the house, Harris could live in the house rent-free for one year. After the year ended, Edwards telephoned the Realtor and said that he would pay rent so that Harris could remain in the house. Edwards never paid rent to the Realtor.[3] Davis and the Legal Services attorney negotiated $300 per month rent payments for Harris. Harris's finances were "very

---

3. Edwards consulted an attorney after the criminal investigation began. The attorney testified at Edwards and Pamela's trial. The attorney stated that, based on the information recounted by Edwards, he counseled Edwards not to pay Harris's rent after the one-year period expired.

tight" because of the rent and her high medical expenses. *Record* at 214. Harris was able to remain in the home until the spring of 1998 with the assistance of visiting nurses, family services, and attendant care.

In September 1996, Edwards's uncle, an FBI agent, discovered that Edwards and Pamela had "come into some money". *Record* at 193. Edwards's uncle went to Harris's home and asked Edwards about the circumstances. Edwards told his uncle that he and Pamela had convinced Harris to sign the deed to the home over to them. Edwards and Pamela then sold the home. Edwards told his uncle that he and Pamela paid a small mortgage on the home, gave Harris $3,000, and kept the rest of the proceeds.

Edwards was charged with theft and exploitation of an endangered adult. Pamela was also charged, although the record does not contain the charging informations for Pamela. Edwards and Pamela were tried in a joint trial. They were each represented by separate counsel. Edwards brings this appeal individually.

### 1.

■ Edwards contends that the trial court erred by admitting into evidence, over his objection, the checks written on Harris's account. He contends that the evidence was not admissible under Ind. Evidence Rule 404(b) because the charging informations referred to theft and exploitation stemming from the real estate, not from money in Harris's accounts.

■ We do not reach the merits of Edwards's complaint in this regard. As noted in the facts, Davis testified at great length about the checks without any objection by Edwards or Pamela. Further, without objection by Edwards or Pamela, the State entered into evidence the bank statements upon which the checks were drawn. Edwards first lodged an objection when the actual checks were offered into evidence through the custodian of the documents. At that point, the testimony re-

garding the significance of the checks had been admitted without objection. "Any error in admission of evidence is harmless if the same or similar evidence has been admitted without objection." *Crafton v. State*, 450 N.E.2d 1042, 1055 (Ind.Ct.App. 1983); *see also Decker v. State*, 704 N.E.2d 1101 (Ind.Ct.App.1999) (counsel was not ineffective for failing to object to hearsay testimony that was merely cumulative of the testimony offered by the defendant), trans. dismissed. The issue is waived.

### 2.

■ Edwards contends that the evidence is insufficient to support the conviction for exploitation of an endangered adult. When reviewing the sufficiency of the evidence this court neither weighs evidence nor judges the credibility of witnesses, and will view only the evidence of probative value that supports the verdict together with the reasonable inferences to be drawn therefrom. *Jordan v. State*, 692 N.E.2d 481 (Ind.Ct.App.1998).

In pertinent part, the statute prohibiting the exploitation of an endangered adult states:

(a) A person who recklessly, knowing, or intentionally exerts unauthorized use of the personal services or the property of:

(1) an endangered adult;

\* \* \*

for one's own profit or advantage or for the profit or advantage of another commits exploitation of a dependent or an endangered adult, a Class A misdemeanor.

IC § 35–46–1–12. Pursuant to IC § 35–46–1–1, for the purposes of the above criminal statute, "endangered adult" is defined as:

(a) . . . an individual who is:

(1) at least eighteen (18) years of age;

(2) incapable by reason of mental illness, mental retardation, dementia, habitual drunkenness, excessive use of

drugs, or other physical or mental incapacity of managing or directing the management of the individual's property or providing or directing the provision of self-care; and

(3) harmed or threatened with harm as a result of:

(A) neglect;

(B) battery; or

(C) exploitation of the individual's personal services or property.

(b) An individual is not an endangered adult solely:

(1) for the reason that the individual is being provided spiritual treatment in accordance with a recognized religious method of healing instead of specified medical treatment if the individual would not be considered to be an endangered adult if the individual were receiving the medical treatment; or

(2) on the basis of being physically unable to provide self care when appropriate care is being provided.

Ind.Code Ann. § 12–10–3–2 (West Supp. 1999).

Edwards makes no argument with regard to Harris meeting the definition of an endangered adult. Edwards contends that the evidence with regard to the transaction involving Harris's home does not support the conviction. He contends that the jury necessarily relied upon the evidence of irregularities in Harris's checking account to convict him of exploitation. We do not agree.

Despite Edwards's efforts to cast his actions in a different light, the evidence discloses: 1) that Edwards and Pamela convinced Harris to sign a warranty deed giving them her home, 2) that Harris did not know that she had signed papers giving Edwards and Pamela her home, 3) that Harris believed that she still owned the home after she signed the document, 4) that Harris did not receive any proceeds from the sale of the home, and 5) that

Harris was required to pay rent of $300 per month to remain in the home commencing one year after Edwards and Pamela sold the home and retained the proceeds. Edwards recklessly, knowingly, or intentionally deprived Harris of her property for his own advantage. The evidence supports Edwards's conviction for exploiting an endangered adult.

### 3.

■ Edwards contends that the jury rendered inconsistent verdicts by finding him guilty of exploitation of an endangered adult and not guilty of theft. Edwards contends that the elements are essentially the same for each crime and that the not guilty verdict for theft indicated that there was not sufficient evidence to convict him of exploiting an endangered adult.

When reviewing the consistency of jury verdicts, we will take corrective action only when the verdicts are "extremely contradictory and irreconcilable." *Butler v. State,* 647 N.E.2d 631, 636 (Ind.1995) (quoting *Hoskins v. State,* 563 N.E.2d 571, 577 (Ind.1990)). We will not attempt to interpret the thought process of the jury in arriving at its verdict, and "perfect logical consistency is not required." *Id.*

*Jones v. State,* 689 N.E.2d 722, 724 (Ind. 1997). "[O]rdinarily, when a defendant is acquitted of some charges and convicted of others, the results will survive a claim of [in]consistency where the convictions are supported by sufficient evidence." *Jordan v. State,* 692 N.E.2d at 484. We have concluded that the evidence is sufficient to sustain the conviction for exploitation of an endangered adult.

Further, contrary to Edwards's allegation, the theft statute and the exploitation statute differ in several respects, including the culpability requirement. Theft requires knowing or intentional conduct. Ind.Code Ann. § 35–43–4–2 (West 1998). As set out above, the statute proscribing

exploitation of an endangered adult may be violated by knowing, intentional, or reckless conduct. *Cf. Elliott v. State,* 690 N.E.2d 774 (Ind.Ct.App.1998) (discussing culpability required for reckless conduct). We do not find the verdicts inconsistent.

Judgment affirmed.

NAJAM, J., and RILEY, J., concur.