Ronald PARKS, Appellant–Defendant,

v.

STATE of Indiana, Appellee.

No. 45A03–9908–CR–331.

Court of Appeals of Indiana.

Sept. 7, 2000.

Transfer Denied Nov. 8, 2000.

Herbert I. Shaps, Mayer & Shaps, Merrillville, Indiana, Attorney for Appellant.

Karen M. Freeman–Wilson, Attorney General of Indiana, Timothy W. Beam, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

## OPINION

SULLIVAN, Judge

Appellant, Ronald Parks (Parks), appeals his convictions for Rape,[1] a Class B felony, and Criminal Confinement,[2] a Class D felony.

We affirm.

Parks presents four issues for our review, which we restate as follows:

(1) Whether the trial court abused its discretion in denying Parks' motion for a mistrial;

(2) Whether the jury verdict of guilty of rape is inconsistent with the verdict of not guilty of criminal deviate conduct;

(3) Whether the evidence was insufficient to sustain Parks' convictions of rape and confinement due to "incredibly dubious" testimony; and

(4) Whether Parks' convictions of rape and confinement improperly resulted in convictions of both an offense and an included offense in violation of I.C. 35–38–1–6.

The facts reveal that on August 13, 1997, T.A. went to a bar across the street from her home to celebrate her 30th birthday while her husband watched their three children. After having a few drinks, she decided to go to another bar where she saw a high school friend and former boyfriend, Michael Pace (Pace). T.A. had a few more drinks and then Pace asked her

---

1. I.C. 35–42–4–1 (Burns Code Ed. Repl.1998).

2. I.C. 35–42–3–3(2) (Burns Code Ed. Repl. 1998).

if she wanted to go with him to pick up a friend. She agreed and accompanied Pace to the Hammond American Inn. On the way to the American Inn, T.A and Pace smoked marijuana.

Pace went into the American Inn while T.A. waited in the car. A short time later, Pace came back out and told T.A. he was going to be there a little longer and asked her to come inside. She accompanied Pace to a room on the second floor where there were two men and three females. After a few minutes, T.A. went to the restroom, but when she came back, Pace was no longer in the hotel room. After some time had passed and Pace failed to return, Parks offered to take T.A. home. She asked Parks what he expected for the ride home, but Parks stated that he did not want anything.

T.A. got into the car with Parks and directed him toward her home. Parks, however, did not exit onto Michigan Avenue as T.A. instructed, but instead took the Gary exit. At that point, T.A. told Parks to let her out and she would walk home. Parks did not comply and grabbed her by the wrist. T.A. tried, but was unable to open the car door because the doors were locked. She began to cry and again asked Parks to take her home or let her out of the car. Parks continued to drive while holding onto T.A.'s arm. On more than one occasion, Parks told T.A. that she better stay close to him because the people out there would not like her.

Parks stopped the car near the side and rear of a one-story brick building, later determined to be the Gotham Hotel in Gary.[3] Once stopped, Parks reached across T.A., leaned her seat back, and got on top of her. While T.A. begged him "please

don't do this" and told him that she was unable to have sexual intercourse due to a medical condition,[4] Parks pulled down her underwear, pinned her arms down, and put his penis inside her vagina. Record at 207. Then, Parks told T.A. to put her underwear back on and they both went up to the building. Parks knocked on one of the doors and a female answered.

Upon entering the room, Parks asked the female who answered the door to leave. After she left, Parks pushed T.A. onto the bed and forced T.A.'s head upon his penis. Parks then pushed T.A. back onto the bed and placed his penis in her vagina. Each time she tried to get up, Parks pushed her back onto the bed. Eventually, Parks told T.A. to go into the bathroom and wash up, which she did. Upon returning from the bathroom, Parks informed her that a female tried to cash one of T.A.'s checks, but was unsuccessful. Parks told her that he would take her home after she went to Wiseway to cash a check for him. Parks drove T.A. and another female to Wiseway.

As soon as the car pulled into the Wiseway parking lot, T.A. jumped out of the car, ran into the Wiseway and asked a man at the service desk if she could use the phone. T.A. telephoned the police and her husband. Linda Burns (Burns), while working in her capacity as a security guard at Wiseway,[5] noticed that T.A. was shaking and crying. Eventually, T.A. told Burns that she had been raped. Burns also called the police. The police and an ambulance arrived, but T.A. refused to go to the hospital at that time. However, at some point, T.A. went to the hospital for an examination.

---

3. In her testimony, T.A. describes a one-story brick building that appeared to be apartments. Parks stipulated to the fact that he drove T.A. to the Gotham Hotel in Gary and engaged in sexual intercourse with her there. Apparently, the Gotham Hotel is a one-story apartment complex with several adjacent buildings in which people can rent rooms upon occasion or on a weekly basis.

4. The medical condition made it very painful for T.A. to have sexual intercourse.

5. Burns is also employed as a Gary Auxiliary Police Officer.

At the hospital, personnel took swabs from T.A.'s mouth and vagina, collected samples of hair from her head as well as pubic hair, and charted bruises on her arms, wrists, legs, and chest. Indiana State Police Lab results determined that seminal fluid found in T.A.'s vagina and on her underwear belonged to Parks.

On August 15, 1997, Detective Mary Ann Banks (Banks), a sex crimes investigator for the Gary Police Department, took a statement from T.A. regarding what had occurred. At that time, T.A. identified Parks in a photograph.

At some point, Detective Banks also questioned Parks. After waiving his Miranda rights, Parks stated that he met T.A. at the American Inn in Hammond and that they were later at the Gotham Hotel in Gary, but that he only laid on the bed next to her and there was no sexual contact. Later, Parks stipulated to engaging in sexual intercourse with T.A. at the Gotham Hotel.

A jury found Parks guilty of rape and confinement, but acquitted him of criminal deviate conduct.

### I. Denial of Motion for Mistrial

■ Parks contends that the trial court abused its discretion in denying Parks' motion for a mistrial. During a lunch recess at trial, Detective Banks[6] was seated in the soft drink area where seating was available having a conversation with her friend, Mr. Palmer (Palmer). Subsequently, one of the jurors came and sat down nearby. When the juror overheard Palmer discussing his retirement, he engaged Palmer in conversation about enjoying retirement. Three other jurors were also nearby. Detective Banks did not engage in conversation with any of the jurors. When a juror engaged Palmer in conversation, Detective Banks commented to Palmer that retirement must be nice. Detective Banks stated that she did not leave the area where jurors were present

because she was there first. At some point, Detective Banks did leave the soft drink area after being asked to do so by someone from the court's staff.

Subsequently, Parks requested a mistrial. Both the prosecutor and Parks' attorney questioned Detective Banks. Then, the trial judge questioned the four jurors. The four jurors were not placed under oath and were not admonished. When questioned by the trial judge, the juror who spoke with Palmer stated that he did not talk to Detective Banks, the case was not mentioned, and that the contact with her would not influence him in any way. Similarly, the other three jurors stated that they were near Detective Banks in the soft drink area, but did not have a conversation with her, did not hear the case being discussed, and that this would not influence their decision in this case. Both the prosecutor and Parks' attorney were given an opportunity to question the jurors, but both declined. Thereafter, the trial court denied Parks' motion for a mistrial.

■ The trial court is deemed to be in the best position to assess the impact of a particular event upon the jury. *Agnew v. State* (1997) Ind.App., 677 N.E.2d 582, 583, *trans. denied.* Thus, the decision of whether to grant or deny a motion for mistrial is committed to the sound discretion of the trial court and will be reversed only upon an abuse of that discretion. *Price v. State* (1995) Ind.App., 656 N.E.2d 860, 863, *trans. denied.* A mistrial is an extreme remedy and should only be granted when no other remedy can cure the error. *Id.*

Parks cites *May v. State* (1999) Ind., 716 N.E.2d 419, *Kelley v. State* (1990) Ind., 555 N.E.2d 140, and *Woods v. State* (1954) 233 Ind. 320, 119 N.E.2d 558, in support of his contention that the trial court abused its discretion in denying his motion for a mis-

---

6. Detective Banks was the State's first witness to testify and afterward, was allowed to re-

main at counsel's table to assist the prosecutor.

trial. However, each of these cases is distinguishable from the instant case.

In *May, supra,* 716 N.E.2d at 419, 420, one of the State's witnesses, a police officer, initiated contact with a juror[7] when he saw him during a lunch break at a local restaurant. The officer admitted that he initiated the contact with the juror, but stated that they had merely exchanged greetings. *Id.* at 422. However, the juror revealed that he had invited the officer to his house the following weekend to watch a pay-per-view boxing match on television. *Id.* In reversing the trial court's denial of defendant's request to replace the juror and remanding for a new trial, our Supreme Court stated that the extra-judicial juror communication was more than just the mere exchange of pleasantries and that it affected the juror's ability to assess the officer's credibility as a witness. *Id.* at 422–23.

In *Kelley, supra,* 555 N.E.2d at 141, the State's sole witness, a security guard, had lunch with half of the jury. The security guard had been overheard saying to three jurors, " 'I seen him do it,' " and one of the jurors had been heard to say, " 'I could see him do that.' " *Id.* However, it was unknown whether these comments referred to the defendant on trial. *Id.* The jurors and witness admitted having lunch together, but denied discussing the trial. *Id.* Despite the three jurors' assertions that their impartiality was intact, our Supreme Court reversed the trial court's denial of defendant's motion for mistrial due to the highly probable enhancement of the credibility of the State's witness from the interaction. *Id.* at 142.

In *Woods, supra,* 233 Ind. at 323, 119 N.E.2d at 560, on more than one occasion, police officers who were witnesses for the State and the sheriff who had been active in solving the crime, visited with members of the jury in the room where the jury gathered during intermissions and recesses. Our Supreme Court concluded that

even though the case was not discussed, the jury could be unconsciously influenced by "a friendly association with the witnesses for the State." *Id.*

In each of these cases, a state's witness had direct communication with one or more jurors. In the instant case, Detective Banks did not communicate with any of the jurors. At most, she commented in front of one juror to Palmer that retirement "must be nice" and was seated in the soft drink area where three other jurors were present. Record at 409. All of the jurors questioned stated that they did not have a conversation with Detective Banks and that they did not hear the case being discussed. Merely being present in the vicinity of jurors and making a comment regarding retirement within earshot of a juror does not rise to the level of a juror inviting a witness to his house to watch boxing the next weekend as in *May, supra,* 716 N.E.2d at 422, eating lunch with jurors as in *Kelley, supra,* 555 N.E.2d at 141, or visiting with members of the jury on more than one occasion where the jurors gathered during breaks in the trial as in *Woods, supra,* 233 Ind. at 323, 119 N.E.2d at 560.

Further, in each of these cases, the Indiana Supreme Court consistently expressed the importance of whether a juror's ability to assess the credibility of a witness has been affected by contact with a witness. *See May, supra,* 716 N.E.2d at 423; *Kelley, supra,* 555 N.E.2d at 142; and *Woods, supra,* 233 Ind. at 323, 119 N.E.2d at 560. In the instant case, the trial judge questioned each juror as to whether contact with Detective Banks would affect the juror's decision in this case and each answered that it would not. Thus, the trial judge took steps to ensure that the jurors' ability to assess credibility was intact and that each could render an impartial verdict.

---

7. The juror stated during voir dire that he knew the officer, but that they had not seen

each other for over fifteen years. *May, supra,* 716 N.E.2d at 420.

It is true that in some instances, "the extra-judicial juror conduct is so fundamentally harmful to the appearance of the fair and impartial administration of justice, it will be considered 'prima facie prejudicial' to the defendant, irrespective of whether the communication concerned a matter pending before the jury." *May, supra,* 716 N.E.2d at 422. While it would have been preferable for Detective Banks to have left the area and to have avoided any contact with members of the jury, based upon the facts before us, we cannot say that the trial court abused its discretion in denying Parks' motion for a mistrial. In light of the fact that Detective Banks did not engage in a conversation with the jurors, the case was not discussed, and each juror stated that being in the proximity of Detective Banks would not influence their decision about this case, the extreme remedy of mistrial was not required. However, we remind trial judges that the Indiana Code of Judicial Conduct obligates them to manage a trial in such a way as to avoid even the appearance of impropriety. See IND. JUDICIAL CONDUCT CANON 2. Thus, care should be taken by court personnel to avoid even such seemingly innocent and accidental contact between jurors and others involved in the trial.

## II. Sufficiency of the Evidence

■ Parks argues that the evidence is insufficient to sustain his convictions because T.A.'s testimony is "incredibly dubious." He points to numerous inconsistencies in T.A.'s account of what took place during the incident in question. Parks maintains that she claimed to be with him for about fourteen hours, but she can only remember four hours, and that she testified that she was wearing a flowered sundress, but Burns testified that she was wearing a top and a pair of pants. Parks also asserts that it would have been physically impossible to hold T.A.'s arm tightly while driving for a substantial period as T.A. testified to at trial. Further, Parks suggests that the manner in which T.A.

described the sexual intercourse that took place in Parks' car would have been physically impossible to complete by force.

■ A reviewing court will impinge upon the jury's responsibility to judge the credibility of witnesses only when confronted with inherently improbable testimony, or coerced, equivocal or wholly uncorroborated testimony of incredible dubiosity. *Moreland v. State* (1998) Ind. App., 701 N.E.2d 288, 291. "The rule of incredible dubiosity is limited to cases where a sole witness presents inherently contradictory testimony which is equivocal or the result of coercion and there is a complete lack of circumstantial evidence." *Id.*

T.A.'s testimony, however, was not equivocal, inherently contradictory, or the result of coercion. Parks neither directs us to that portion of the record indicating T.A. spent fourteen hours with Parks, but can only remember four of those hours, nor do we find it. The fact that T.A. testified that she was wearing a sundress while Burns testified that she was wearing something else goes to T.A.'s credibility as a witness. T.A.'s explanation of Parks holding her arm and the sexual intercourse that took place in the car is not inherently improbable. Moreover, T.A.'s testimony is corroborated by circumstantial evidence. Parks denied having sexual relations with T.A. in his initial interview, but his seminal fluid was found in T.A.'s vagina and underwear. While T.A.'s medical records indicate that T.A. had some old bruises, they also note that upon examination she was upset and crying, had a laceration and scratches on her left hand, a scratch on her right hand, several small red marks on her shoulder and chest, red blotchy areas on her wrists, and a few small knee scrapes and reddish brown bruises on her inner thighs.

Parks' argument is merely an invitation to reweigh the evidence, which we will not do. Although a different trier of fact may have chosen to believe Parks' claims that there was consent and that there was no

force or threat of force[8] to support the convictions, the trier of fact was entitled to believe T.A.'s testimony and we will not disturb the jury's determination.

In order to convict Parks of rape, the State had to prove that Parks knowingly or intentionally had sexual intercourse with T.A. when T.A. was compelled by force or imminent threat of force. *See* I.C. 35–42–4–1. To convict Parks of confinement, the State had to establish that Parks knowingly or intentionally removed T.A. from one place to another by fraud, enticement, force or threat of force. *See* I.C. 35–42–3–3(2).

T.A. testified unequivocally that while purporting to drive her home, Parks held her wrist so that she could not get out of the vehicle, and instead drove to the Gotham Hotel where he pinned her arms down and had sexual intercourse with her. Then Parks took T.A. into the Gotham Hotel, pushed her onto the bed, and had sexual intercourse with her again. Each time T.A. tried to get up from the bed, Parks pushed her back down. Thus, evidence was sufficient to convict Parks of rape and criminal confinement.

### III. Inconsistency of Jury Verdicts

Parks maintains that the jury's verdicts of guilty of rape and not guilty of criminal deviate conduct are inconsistent and irreconcilable. Parks maintains that T.A. testified in similar detail regarding both the rape and criminal deviate conduct, and because the jury must have rejected her testimony concerning the criminal deviate conduct, the rape conviction should not be upheld.

"[I]t is not within our province to attempt to interpret the thought process of the jury in arriving at their verdict. . . . The reason for allowing the jury to render verdicts, that are seemingly inconsistent, inheres within our system of jurisprudence. The jurors are the triers of fact, and in performing this function, they may attach whatever weight and credibility to the evidence as they believe is warranted." *Hicks v. State* (1981) Ind. 426 N.E.2d 411, 414. The jury is free to believe portions of the victim's testimony and disregard other portions of the testimony. *Hodge v. State* (1997) Ind., 688 N.E.2d 1246, 1249. An appellate court will review verdicts to determine whether they are consistent. Be that as it may, perfect logical consistency is not required and only extremely contradictory and irreconcilable verdicts warrant corrective action. *Edwards v. State* (2000) Ind.App., 730 N.E.2d 1286, 1290. Normally, where the trial of a defendant results in acquittal upon some charges and convictions upon others, the results will survive a claim of inconsistency where the evidence is sufficient to support the convictions. *Id.*

The charge from which Parks was acquitted was based upon deviate sexual conduct, while the rape conviction was based

---

**8.** Parks' reliance upon *Jones v. State* (1992) Ind., 589 N.E.2d 241, for the proposition that force or threat of force was lacking is misplaced. Parks argues that as in *Jones*, there is no evidence of any previous threats or force against T.A. at the American Inn and that she voluntarily got into the car. In *Jones*, C.L. and her foster mother lived with Jones and his wife. One night, Jones went into C.L.'s bedroom and asked her to have sex with him. She refused two times, but on the third time, she " 'just let him have it.' " *Id.* at 242. C.L. was on her side in bed and Jones turned her over and had sexual intercourse with her. *Id.* Our Supreme Court held that there was no evidence that Jones used any force or threats to encourage C.L. to engage in sexual intercourse.

In contrast, T.A. was crying, asked Parks to please not do this, and told him she could not have intercourse because of a medical condition, but he pinned down her arms and had sexual intercourse with her anyway. Also, while in the Gotham Hotel, Parks repeatedly pushed T.A. onto the bed and had sexual intercourse with her. Thus, there was evidence that Parks used force. *See Ives v. State* (1981) 275 Ind. 535, 418 N.E.2d 220, *reh'g denied* (sufficient evidence of force when rape victim cried, screamed, told defendant to stop, and tried to prevent him from removing her clothing, but he pinned her down); *Jenkins v. State* (1978) 267 Ind. 543, 372 N.E.2d 166 (sufficient evidence of force when defendant broke into rape victim's home, demanded her money, and pushed her onto the bed).

upon sexual intercourse. "Simply because the jury might not have found sufficient facts to convict on one charge, ... does not mean they could not find sufficient facts to convict on another charge based on different underlying conduct." *Wallace v. State* (1986) Ind., 492 N.E.2d 24, 25 (holding that verdicts of guilty for child molesting based upon sexual intercourse and a verdict of not guilty of sexual deviate conduct were not inconsistent). Regardless of the reasons the jury may have had for not convicting Parks of criminal deviate conduct, we have concluded that the evidence supports the rape conviction and thus, it stands upon its own sufficiency analysis.

### IV. IND.CODE 35-38-1-6

Parks argues that his convictions of rape and criminal confinement violate I.C. 35–38–1–6 (Burns Code Ed. Repl.1998), because confinement, in this context, is a lesser included offense of rape. While Parks concedes that confinement is not an inherently lesser included offense of rape, he contends that in this case, the evidence precludes a conviction upon both counts because it is equivalent to convicting him twice for the same conduct.[9] We disagree.

I.C. 35–38–1–6 provides that "[w]henever: (1) [a] defendant is charged with an offense and an included offense in separate counts; and (2) [t]he defendant is found guilty of both counts; judgment and sentence may not be entered against the defendant for the included offense." I.C. 35–38–1–6 protects defendants charged with an offense and an included offense from being found guilty of both charges as this is equivalent to convicting a defendant twice for the same conduct. *Harvey v. State* (1999) Ind.App., 719 N.E.2d 406, 411. An offense may be either inherently or factually included in another offense. *Id.*

Any confinement of a victim beyond that inherent in the force used to effectuate the rape constitutes a violation of the confinement statute apart from the violation inherent in the offense of forcible rape. *Griffin v. State* (1992) Ind.App., 583 N.E.2d 191, 195. Without analyzing the facts of the instant case, Parks alleges that the confinement was only that necessary to effectuate the rape. In the instant case, however, the confinement charge involved "remov[al] ... from one place to another" and was proved separate and apart from the two separate incidents which the jury may have used to convict Parks of rape. Record at 10. Before raping T.A., Parks drove T.A. in his car to the Gotham Hotel instead of taking her home. Parks also took T.A. to the Wiseway to cash a check after the rapes had been committed. Parks confined T.A. beyond the confinement that occurred during the rape. Thus, Parks' convictions of both criminal confinement and rape do not violate I.C. 35–38–1–6.

The judgment is affirmed.

BAILEY, J., and VAIDIK, J., concur.

---

9. Parks does not present a United States or Indiana constitutional argument, but instead relies solely upon a statutory double jeopardy argument.