Christopher ANDERSON,
Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 49A02–0110–CR–720.

Court of Appeals of Indiana.

July 10, 2002.

Kenneth T. Roberts, Roberts & Bishop, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Robin Hodapp–Gillman, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BARNES, Judge.

### Case Summary

Christopher Anderson appeals his convictions for murder, possession of a firearm by a serious violent felon, and intimidation, as well as the habitual offender enhancement of his sentence. We affirm.

### Issues

Anderson presents the following five restated issues for our review:

I. whether the trial court erred in permitting a witness who sat through part of voir dire to testify when there was a separation of witnesses order;

II. whether the trial court erred in allowing the State to introduce evidence that he was found by law enforcement officials in Alabama after the murder;

III. whether the trial court should have ordered a mistrial when one juror indicated during deliberations that she recognized one of the courtroom spectators;

IV. whether there was sufficient evidence to support the murder and intimidation convictions; and

V. whether the enhancement of his murder sentence because of his habitual offender status was improper because one of the prior convictions used to establish that status also established that he was a serious violent felon.

### Facts

The evidence most favorable to the judgment reveals that in the early morning hours of May 19, 2000, Anderson's girlfriend, Doria White, and Andre Clarke arrived at White's apartment and found Anderson and Andre's cousin, Robert Clarke, in the kitchen. Anderson began arguing with Andre, accusing him of having "somethin' goin' on" with White. Tr. p. 66. Anderson pulled out a gun and threatened to rob Andre. White ran out of the apartment and went to a neighbor's house. When she called her apartment later to see what was happening, Anderson answered the phone and assured her that everything was okay.

As White was returning to her apartment, however, Andre and Anderson began arguing again. Anderson then shot Andre three times, killing him. He next pointed the gun at Robert's head and threatened to kill him if he said anything.

Anderson ran out the front door. Robert and White, who heard the gunshots, called the police. Officer Brandon Mills arrived at the scene approximately thirty seconds after receiving the dispatch and found Robert kneeling next to Andre. No weapon was found on Robert or in the residence.

On May 26, 2000, the State charged Anderson with murder, possession of a firearm by a serious violent felon, carrying a handgun without a license, and intimidation. He was also alleged to be an habitual offender. The serious violent felon firearm charge alleged a 1987 robbery conviction as the relevant violent felony; the habitual offender charge alleged as the predicate offenses that same conviction and a 1994 conviction for carrying a handgun without a license as a Class D felony.

Anderson's whereabouts were unknown until June 28, 2000, when he was arrested in Birmingham, Alabama. He was returned to Indiana, where a jury trial was conducted on May 21 and 22, 2001. During deliberations, a juror informed the trial court that she had recognized one of the courtroom spectators who she believed was sitting with Anderson's supporters in the courtroom. The trial court was prepared to remove this juror, but Anderson objected to this proposed measure and moved for a mistrial instead. The trial court denied the motion. Anderson was found guilty of all charges and was found to be an habitual offender. The trial court imposed a sentence of sixty years for the murder conviction, enhanced by thirty years for the habitual offender finding, ten years for the serious violent felon firearm conviction, and four years for the intimidation conviction, all to be served consecutively for a total executed sentence of 104 years. No sentence was imposed for the handgun conviction. Anderson now appeals.

## Analysis

### I. Violation of Separation of Witnesses Order

■ Anderson's first argument is that the trial court should have excluded the testimony of Robert Clarke, the State's key witness, because he sat through a portion of the jury voir dire after a separation of witnesses order had been entered. The purpose of a witness separation order is to prevent the testimony of one witness from influencing another. *Corley v. State,* 663 N.E.2d 175, 176 (Ind.Ct.App.1996). In the absence of connivance or collusion by the prosecutor, a trial court has discretion in allowing a State witness to testify after the violation of a separation order. *Id.* We will not disturb a trial court's decision on such matters absent a showing of a clear abuse of discretion. *Jordan v. State,* 656 N.E.2d 816, 818 (Ind.1995).

There is no indication in this case of any connivance or collusion by the State with respect to Robert Clarke's presence in the courtroom during a portion of the jury selection process. The deputy prosecutor informed the trial court that when he noticed Robert was in the courtroom, he asked a police detective to remove him. Given the lack of evidence of connivance or collusion, the trial court had discretion to permit Robert to testify.

We acknowledge that Indiana Trial Rule 615 requires a trial court to grant a motion for separation of witnesses. We also believe that the case of *Bell v. State,* 495 N.E.2d 526, 527 (Ind.1986), although it predates the adoption of Rule 615, is instructive as to what a separation order is intended to protect against: witnesses hearing the testimony of other witnesses, or discussing their testimony, and tailoring their testimony accordingly. The *Bell* court discussed the general differences between trial testimony and jury voir dire and held it would not infer prejudice to the

defendant from witnesses sitting through voir dire against the defendant's wishes. *Id.* The court did note, however, that the "appellant's concern is not without some basis," which suggests the possibility that a defendant could be prejudiced in such a situation if the claim of prejudice can be substantiated. *Id.*

Here, however, Anderson did not request a transcript of the jury selection process and thus he has not provided us with any method of evaluating for ourselves what facts of the case, if any, were related to the prospective jurors in Robert's presence. We do have the following on-the-record statement of the trial court, however: "I think it was probably the first voir dire I've heard in a long time where the lawyers didn't try their case ... I don't know any of the facts of this case. And if I don't know any of the facts of this case—certainly, Mr. Clarke couldn't have heard that." Tr. p. 24. Because there is no claim that Robert heard any testimony of other witnesses, or discussed his testimony with others, and there is no showing suggesting he "adjusted" his testimony based upon what he might have heard during voir dire, there is no basis for concluding the trial court abused its discretion by permitting Robert to testify.

## II. Evidence of Anderson's Alleged Flight

 Next, Anderson contends the trial court erred by permitting the State to present evidence, over his objection, that the law enforcement officials found him in Birmingham, Alabama approximately one month after Andre Clarke's shooting. The admissibility of evidence is within the sound discretion of the trial·court and will not be disturbed absent a showing that the trial court abused its discretion. *Leitch v. State*, 736 N.E.2d 1284, 1286 (Ind.Ct.App. 2000), *trans. denied.* Although it is im-

proper to give a jury instruction highlighting such evidence, "[f]light and related conduct may be considered by a jury in determining a defendant's guilt." *Dill v. State*, 741 N.E.2d 1230, 1232 (Ind.2001). No flight instruction was given in this case. "Absenting oneself from the community in which a crime has been committed may imply guilty knowledge even though it does not evince the planning of an experienced criminal." *Bruce v. State*, 268 Ind. 180, 248, 375 N.E.2d 1042, 1078 (1978), *cert. denied,* 439 U.S. 988, 99 S.Ct. 586, 58 L.Ed.2d 662 (1978).[1]

Anderson correctly notes that evidence of flight is not probative unless tied to some other evidence that is strongly corroborative of the actor's intent to commit a specific felony. *Desloover v. State*, 734 N.E.2d 633, 635 (Ind.Ct.App.2000), *trans. denied.* The other evidence must provide a solid basis to support a reasonable inference that the defendant intended to commit the underlying, specifically charged felony. *Id.* Here, there was ample independent evidence of Anderson's intent to commit murder, particularly Robert Clarke's testimony that he saw Anderson shoot Andre Clarke. The evidence of Anderson's whereabouts following the shooting, therefore, had probative value.

Anderson further claims that any probative value of this evidence was outweighed by its prejudicial effect, rendering the evidence inadmissible. He asserts there was no evidence that he fled immediately after the commission of the murder, citing cases that state "[a] jury may consider evidence of flight of the accused immediately after the commission of a crime as evidence of his consciousness of guilt." *Seeley v. State*, 547 N.E.2d 1089, 1092 (Ind.1989). To the extent the State arguably was required to demonstrate that Anderson's

---

**1.** *Bruce* would seem to have been partially abrogated by *Dill,* only to the extent it went

on to hold that it was proper to give a jury instruction on flight.

flight was "immediate," there was such evidence in this case. Robert testified that after Anderson shot Andre and threatened to kill Robert, Anderson ran out the door. Police Detective Alan Jones testified that in the three to four days following the shooting, he unsuccessfully attempted to locate Anderson at his known past addresses and through his relatives. At that point, Jones asked for assistance from the U.S. Marshal's Office in locating Anderson, and he was finally arrested in Birmingham on June 28, 2000. Anderson had no known previous addresses in Alabama. This evidence amply demonstrates that Anderson immediately left the scene of the crime and the community in which he lived following the shooting.

■ Finally, Anderson claims that because there was no evidence presented as to why he was in Alabama, "the evidence does not satisfactorily show that Anderson fled to avoid arrest." Appellant's Br. p. 15. To be admissible, however, the evidence of Anderson's location did not have to definitively demonstrate that he had fled to avoid arrest to the exclusion of any other inferences. "[W]here reasonable jurors could place either of two differing interpretations upon a set of facts, and one of those interpretations is· material to an issue in the case, evidence of those facts is admissible...." *Bruce*, 268 Ind. at 248–49, 375 N.E.2d at 1078. The jury in this case reasonably could have inferred that he had fled the scene of the crime and his community in an effort to avoid prosecution, which was sufficient to allow this evidence to be introduced. *See id.* The trial court did not abuse its discretion in overruling Anderson's objections to this evidence.

### III. Denial of Mistrial Motion

■ Anderson argues the trial court should have declared a mistrial following one juror's revelation that she recognized a courtroom spectator, who she believed

was sitting with Anderson's supporters and who she overheard saying that she recognized the juror. The trial court is in the best position to assess the impact of a particular event upon the jury. *Parks v. State*, 734 N.E.2d 694, 697 (Ind.Ct.App. 2000), *trans. denied.* Thus, the decision of whether to grant or deny a motion for mistrial is committed to the sound discretion of the trial court and will be reversed only upon an abuse of that discretion. *Id.* The denial of a motion for mistrial will be reversed only upon a showing that the defendant was placed in a position of grave peril to which he should not have been subjected. *Bedwell v. State*, 481 N.E.2d 1090, 1093 (Ind.1985). The declaration of a mistrial is an extreme action and is warranted only when no other action can be expected to remedy the situation. *Id.* The burden on appeal is upon the defendant to show that he was placed in grave peril by the denial of the mistrial motion. *Id.* The defendant on appeal also has the burden to show that no other action could have remedied the perilous situation into which he was placed. *Id.*

It was during deliberations that one of the jurors informed the trial court of her recognition of the spectator and the spectator's recognition of her. Apparently, the juror initially did not believe that this incident needed to be brought to the trial court's attention, but her fellow jurors persuaded her to do so out of concern that it might affect the juror's ability to vote her conscience. The juror, however, indicated that she was "very confident" the incident would not have that effect. Tr. p. 195. She also indicated that she was not concerned about the incident until her fellow jurors urged her to report it to the trial court and that the incident was not entering into the jury's deliberations regarding Anderson's guilt or innocence. The juror, however, did state that although "it probably wouldn't happen ... it could happen,

that I am intimidated by the—some of the spectators," and for that reason she did ask to be removed from the jury. Tr. p. 185. The trial court was prepared to replace the juror with an alternate, but Anderson objected to this proposed procedure and moved for a mistrial instead. The trial court denied this motion, kept the juror on the panel, and individually polled all the jurors as to whether there was anything about the incident "that would interfere with your individual ability to return a fair and impartial verdict based only on the evidence in this case." Tr. p. 196. Each juror responded in the negative, and the jury was asked to continue deliberating.

It is Anderson's burden on appeal to demonstrate that a mistrial was the only way to avoid being placed in grave peril by the juror's recognition of a courtroom spectator and vice versa. Specifically, he must demonstrate to us that the trial court's proposed lesser remedy of removing the juror, which Anderson rejected, was inadequate. He has not done so. Despite Anderson's speculations to the contrary, there is nothing in the record to indicate that the other jurors' impartiality was adversely affected by the incident or that they "already determined that Anderson was a violent person." Appellant's Br. p. 18. The juror in question was asked by defense counsel whether it was "true that some jurors—if not all—are deliberating with an eye toward whether something may happen to them as a result of their vote," to which the juror responded "No ... that is not happening at

all. . . . They—they wrote [a note to the trial court] because of concern for me. And that's the only reason they wrote it." Tr. p. 189. It would appear to us that the simplest, most expedient way to alleviate the concern of the other jurors as to whether the "tainted" juror could be impartial would be to remove that juror. Having rejected a lesser remedy that could have removed any possible appearance of improper adverse effect upon the jury's partiality, Anderson cannot now claim that his mistrial motion should have been granted.[2]

Alternatively, even if the trial court had overruled a defense motion to remove the juror in question, we would conclude that the juror remaining on the panel did not place Anderson in a position of grave peril. The juror was questioned at considerable length and indicated on several occasions that she would have no difficulty in voting in accordance with her conscience. She also testified that the other jurors were not taking the incident into account in their deliberations. Each juror individually attested that the incident would not affect his or her ability to return a fair and impartial verdict. No express threat was made against the juror, nor was there any communication of any kind for that matter; there was simply a moment of recognition. We cannot discern the existence of any undue prejudice arising from the juror's remaining on the panel. The trial court did not abuse its discretion in denying Anderson's mistrial motion.

2. We further observe that Anderson contends the entire jury should have been interrogated to determine the effect the incident had on each individual juror. In a case alleging an improper external influence upon a jury, a trial court only needs to conduct an in-court interrogation of the full jury if the trial court makes a threshold determination that the extraneous information created a risk of prejudice that is substantial, rather than imaginary or remote. *See Joyner v. State*, 736 N.E.2d 232, 239 (Ind.2000). Here, based on the juror in question's statements to the trial court, it reasonably could have determined that any risk of prejudicial influence on the rest of the jurors caused by the incident was imaginary or remote, thus removing the need to conduct a full collective interrogation.

## IV. Sufficiency of the Evidence

 Anderson also asserts that there is insufficient evidence to support his convictions for murder and intimidation. In reviewing a sufficiency of the evidence claim, we neither reweigh the evidence nor assess the credibility of the witnesses. *Love v. State*, 761 N.E.2d 806, 810 (Ind. 2002). We look to the evidence most favorable to the verdict and reasonable inferences drawn therefrom. *Id.* We will affirm the conviction if there is probative evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *Id.* Any inconsistencies in a witness' testimony go to the weight and credibility of the testimony, the resolution of which is within the province of the trier of fact. *Jordan v. State*, 656 N.E.2d 816, 818 (Ind.1995).

Anderson's murder and intimidation convictions rest in large part on the testimony of Robert Clarke. He testified that he was in White's apartment and observed Anderson shoot Andre. After the shooting, Robert testified, Anderson came over to him "and put the gun to my head and was like—if I say anything he'll find me and kill me" before leaving the apartment. Tr. p. 71. Robert admitted that this testimony was not entirely consistent with what he first told the police—namely, that he had left the apartment with Anderson and Andre inside and returned later to find Andre shot and Anderson gone. Robert testified that he had told the police a different story when he first spoke to them because he feared for his life and Anderson was not in custody, but that he contacted the police a few days later and told them the version of events to which he testified at trial.

Anderson focuses on this discrepancy between Robert's first statement to the police and his subsequent statement and trial testimony as causing a fatal insufficiency in the evidence. This is an invitation to judge witness credibility, which is the exclusive province of the jury and something we will not do. Additionally, Robert's testimony was internally consistent, his original statement to the police being explained by Anderson's threat to his life if he said anything about the incident. Furthermore, Robert's testimony was partially corroborated by White, who observed the first argument between Anderson and Andre and Anderson's pulling a gun on Andre. In sum, the evidence is sufficient to support the guilty verdicts.

## V. Habitual Offender Enhancement

 Anderson's final argument is that the trial court erred and contravened precedent of this court by enhancing his total sentence under the habitual offender statute, where one of the predicate offenses establishing Anderson was an habitual offender was also used to convict him of possession of a firearm by a serious violent felon. It is true we have held "that a defendant convicted of unlawful possession of a firearm by a serious violent felon may not have his or her sentence enhanced under the general habitual offender statute by proof of the same felony used to establish that the defendant was a 'serious violent felon.'" *Conrad v. State*, 747 N.E.2d 575, 595 (Ind.Ct.App.2001), *trans. denied.* As the State correctly notes, however, Anderson's sentence for possession of a firearm by a serious violent felon was not enhanced under the habitual offender statute; it was his murder sentence that was enhanced. This is a crucial distinction.

 When a defendant is convicted of multiple felonies and is found to be an habitual offender, trial courts must impose the resulting penalty enhancement upon only one of the convictions and must specify the conviction to be so enhanced. *Greer v. State*, 680 N.E.2d 526, 527 (Ind.1997). "In the case of a habitual offender proceeding following multiple convictions, *the*

*jury finding of habitual offender status is not linked to any particular conviction." Id.* (emphasis added). "[T]he penal consequence of a habitual offender finding has no independent status as a separate crime or punishment and exists only as an integral part of a sentence imposed for a specific independent felony . . . ." *Id.*

Therefore, in the present case, the habitual offender finding existed only as an integral part of the sentence imposed for Anderson's murder conviction, which was independent from and not linked to his conviction for possession of a firearm by a serious violent felon. Our concern in *Conrad* was that the habitual offender finding was in fact linked to and became an integral part of the defendant's sentence for possession of a firearm by a serious violent felon. We declined to hold that one felony could be used twice against a defendant in this particular fashion: first by criminalizing the possession of any firearm by a serious violent felon and second by enhancing a sentence *for that particular crime* under the general habitual offender statute. *Conrad,* 747 N.E.2d at 594–95. The "double enhancement" concern present in *Conrad* is not before us today. We hold that where a defendant is convicted of multiple felonies, one of which is possession of a firearm by a serious violent felon, and is found to be an habitual offender, *Conrad* does not preclude the use of one felony both to prove the defendant was a serious violent felon and an habitual offender, where the sentence for a felony conviction *other than* possession of a firearm by a serious violent felon is the sentence that is enhanced under the general habitual offender statute. The thirty-year habitual offender enhancement of Anderson's murder sentence was not erroneous.

### Conclusion

The trial court did not abuse its discretion by permitting Robert Clarke to testify despite his alleged violation of a witness separation order, by allowing the State to introduce evidence of Anderson's whereabouts following Andre Clarke's shooting, and in declining to declare a mistrial based on one juror's recognition of a courtroom spectator. There is sufficient evidence to support the murder and intimidation convictions. Finally, the trial court did not err in enhancing Anderson's murder sentence under the general habitual offender statute. We affirm in all respects.

Affirmed.

KIRSCH, J., and MATHIAS, J., concur.