John R. MYERS II, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 55A05–0703–CR–148.

Court of Appeals of Indiana.

May 30, 2008.

Patrick V. Baker, Hugh G. Baker, Jr., Baker, Pittman & Page, Timothy E. Peterson, Indianapolis, IN, Attorneys for Appellant.

Steve Carter, Attorney General of Indiana, Joby D. Jerrells, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BRADFORD, Judge.

Today we state once again that a defendant is entitled to a fair trial, not a perfect trial. Concluding the imperfections in the murder trial of John Myers II did not deprive him of a fair trial, we affirm.

Myers appeals his conviction, following a jury trial, for Murder, a felony,[1] for which the trial court sentenced him to sixty-five years in the Department of Correction. Upon appeal, Myers challenges his conviction on the following grounds, including alleged errors by the trial court:

(i) by denying his motion for change of venue;

(ii) by denying his motions *in limine* seeking to exclude testimony of two witnesses;

(iii) by admitting expert testimony regarding the uncharged crime of rape;

(iv) by admitting his taped interrogation without a proper admonition to the jury;

(v) by excluding an FBI report; and

---

1. Ind.Code § 35–42–1–1 (2000).

(vi) by denying his motions for a mistrial on the basis of

    (a) an alleged violation of the separation-of-witnesses order,

    (b) an allegedly improper reference to a polygraph examination,

    (c) an allegedly improper statement of his guilt, and

    (d) alleged jury misconduct;

(vii) that the above alleged errors constitute cumulative error; and

(viii) that there was insufficient evidence to support a finding of guilt.

## FACTS AND PROCEDURAL HISTORY

### I. Facts

During the course of a twelve-day jury trial, evidence of the following was presented. In the spring of 2000, John Myers II lived approximately seven tenths of a mile from the intersection of North Maple Grove Road and West Maple Grove Road, at 1465 West Maple Grove Road, north of Bloomington in Monroe County. Myers was on vacation from work the week of May 29 through June 2.

On the morning of May 31, 2000, Jill Behrman, an accomplished bicyclist who had just completed her freshman year at Indiana University, left her Bloomington home to take a bicycle ride. She logged off of her home computer at 9:32 a.m. Behrman did not report to the Student Recreational Sports Center, where she was scheduled to work from noon to 3:00 p.m. that day, nor did she appear at a postwork lunch scheduled with her father and grandparents. Following nationwide search efforts, Behrman's remains were ultimately discovered on March 9, 2003, in a wooded area near the intersection of Warthen and Duckworth Roads in Morgan County. The cause of her death was ruled to be a contact shotgun wound to the back of the head.

With respect to the events surrounding Behrman's disappearance, one report indicated that a young woman matching Behrman's description was seen riding her bicycle north of Bloomington on North Maple Grove Road at approximately 10:00 a.m. the morning of May 31.[2] A tracking dog later corroborated this report. While another report placed Behrman south of Bloomington at 4700 Harrell Road at approximately 9:38 a.m., some authorities later discounted this report due to her log-off time of 9:32 a.m. and the minimum fourteen minutes it would take to bicycle to Harrell Road. The tracking dog did not detect Behrman's scent trail south of Bloomington.

At approximately 8:30 a.m. on the morning of May 31, 2000, in the North Maple Grove Road area, a witness saw a white "commercial looking" Ford van without identification on its doors or sides drive slowly past his driveway on North Maple Grove Road, heading south. Tr. p. 1257. Two men were inside the van. This witness saw the van two additional times that morning by approximately 9:00 a.m. and later identified the van as "exactly like" a Bloomington Hospital van.[3]

At some point before noon on May 31, 2000, another witness saw a bicycle later determined to be Behrman's lying off of the east side of North Maple Grove Road

---

2. The person making this report was unable to remember whether the date on which he had seen the person matching Behrman's description was May 31 at approximately 10:00 a.m. or the following day, June 1, at approximately 9:00 a.m.

3. Bloomington Police Department Detective Rick Lang was never able to make a positive connection between the hospital van and Behrman's disappearance.

near the intersection of North Maple Grove Road and West Maple Grove Road. The location of the bicycle was approximately one mile from Myers's residence and ten and one-half miles from Behrman's house.

On May 31, the date of Behrman's disappearance, two witnesses separately noted that the windows in Myers's trailer were covered, which was unusual. One of these witnesses also observed that Myers's car was parked fifty yards from its normal location and remained out of sight from the road for approximately three days. Myers told this witness that he had parked his car in that secluded spot because he did not want anyone to know he was home.

Myers's account of his activities during his vacation week of May 29 through June 2 was reportedly that he was "here and there." Tr. p. 1494. Myers's employer at the time was the Bloomington Hospital warehouse, where he had access to two white panel Ford vans. Besides being "here and there," Myers indicated that he had been mostly at home, that he had gone to a gas station, and that he had gone to Kentucky Kingdom but found it was closed.[4] Myers additionally stated that he and his girlfriend, Carly Goodman, had cancelled their plans to go to Myrtle Beach, South Carolina, and to Kings Island, Ohio, that week. Phone calls made from Myers's trailer on May 31 were at the following times: 9:15 a.m.; 9:17 a.m.; 9:18 a.m.; 10:37 a.m.; 10:45 a.m.; and 6:48 p.m. Myers's mother, Jodie Myers, testified that she had made those calls. The calls were to drive-in theaters and various state parks.

Myers was reportedly almost hysterical on May 31 and spoke of leaving town and never coming back. Myers's aunt, Debbie Bell, observed that Myers had been very depressed in the preceding month and believed that this was due to problems with his girlfriend. In late April 2000, Myers had called Bell because he had been having problems with his girlfriend and felt like "a balloon full of hot air about to burst." Tr. p. 1770.

Carly Goodman was Myers's girlfriend beginning in approximately late October 1999. In March of 2000, Myers took Goodman for a long drive through Gosport, "over a bridge where there was a creek and into some woods." Tr. p. 1893. Myers pulled his car into a clearing in the woods where the two of them argued, which scared Goodman. Although it was nighttime, Goodman observed the appearance of this clearing from the car's headlights. In late April or early May of 2000, Goodman broke off her relationship with Myers. Goodman denied that she and Myers had ever made plans to go to Myrtle Beach or to Kings Island the week of May 29.

On June 5, 2000, Bell again spoke with Myers. Myers mentioned that a girl had been abducted in the area, and he was afraid he would be blamed for it. Myers further stated that the girl's bicycle had been found about a mile from his house and that "they blame [him] for everything." Tr. p. 1788. Myers additionally asserted, "[T]hey haven't found her body yet" and guessed that the girl was dead. Tr. p. 1789. In that same conversation, Myers indicated that he had been stopped

---

4. The State introduced evidence demonstrating that on the evening of May 17, 2000, the night before Myers's girlfriend Carly Goodman's class trip to Kentucky Kingdom, Myers had made a phone call from his home to a number in Louisville, Kentucky, which was one digit off from Kentucky Kingdom's phone number. The State suggested that this evidence demonstrated Myers's trip to Kentucky Kingdom was on May 18 rather than during his May 29 week of vacation.

by a roadblock and was "scared" of road-blocks, but he later changed his mind, laughed, and said he was not really "scared." Tr. p. 1789.

Following a tip due to this conversation, on June 27, 2000, Detective Rick Crussen of the Bloomington Police Department interviewed Jodie and Myers's father, John Myers Sr., at their residence at 3909 West Delap Road. The following day, Detective Crussen interviewed Myers.

On June 27, 2000, immediately after Detective Crussen interviewed Myers's parents and the day before he interviewed Myers, Myers called his grandmother, Betty Swaffard, and asked to borrow $200. Myers told Swaffard he was unable to come to her house for the money because there were roadblocks on Maple Grove Road, and he did not want to leave his home. Myers additionally stated that he was a suspect in the Jill Behrman disappearance. Myers did not come to Swaffard's home for the money.

In July 2000, Bell noticed that John Myers Sr. was unusually nervous and agitated when in Myers's presence. Sometime in approximately August of 2000, Myers's brother, Samuel, who owned a twelve-gauge shotgun and had stored it at his parents' house on Delap Road since approximately 1997, noted that the gun was missing.

Myers raised the topic of Behrman's disappearance multiple times and in multiple contexts following her disappearance. Before Detective Crussen interviewed him, Myers falsely stated to his Bloomington Hospital supervisor that police had questioned him in connection with Behrman's disappearance because her bicycle was found close to his home. Also in June of 2000, Myers stated to a co-worker that he wondered whether authorities had investigated a barn in a field located on Bottom Road off of Maple Grove Road. Addition-ally, some weeks after Behrman disappeared, Myers told another co-worker during a delivery run that Behrman's bicycle was found in his neighborhood, and that Behrman was probably abducted near that site. Later in 2000 or 2001, while driving with his then-girlfriend, Kanya Bailey, Myers directed Bailey's attention to a location a short distance from his mother's residence and stated he had found Behrman's bicycle there.

In the late spring to late summer of 2001, Myers again raised the topic of Behrman's disappearance with another co-worker. As the two were driving on Bottom and Maple Grove Roads, Myers pointed out where he lived and stated that Behrman's bicycle had been found close to where he used to live. A short time later, while on Maple Grove Road, Myers stated that if he was ever going to hide a body he would hide it in a wooded area up "this way," pointing north. On another occasion, Myers stated to this co-worker that he knew of someone in Florida who had Behrman's identification card or check-book.

Sometime in November or December of 2001, Myers raised the topic of Behrman's disappearance with a family member, indicating his bet that Behrman would be found in the woods. During this conversation, Myers further indicated his familiarity with the Paragon area and with Horseshoe Bend, where he liked to hunt.

Also in 2001, Myers stated to his mother, Jodie, that he had been fishing in a creek and had found a pair of pan ties and a bone in a tree. Jodie suggested that this might be helpful in the Behrman case, and Myers agreed to call the FBI. FBI Agent Gary Dunn later returned the call and left a message. Myers told Jodie that they should save the answering machine tape in case they were questioned.

Sometime in 2002, Wendy Owings confessed to Behrman's murder, claiming that she, Alicia Sowders–Evans, and Uriah Clouse struck Behrman with a car on Harrell Road, stabbed her with a knife in her chest and heart, wrapped her body in plastic tied with bungee cords, and disposed of her body in Salt Creek. In September 2002, authorities drained a portion of Salt Creek. They found, among other things, a knife, a bungee cord, and two sheets of plastic. Owings later recanted her confession.[5]

On March 27, 2002, Myers, who at the time was in the Monroe County Jail on an unrelated charge, told Correctional Officer Johnny Kinser that he had found some letters in some food trays one morning that he believed Kinser should look at, apparently in connection with the Behrman disappearance. Myers said he felt bad about what had happened to that "young lady" and that he wished to help find her if he could. Myers additionally compiled a list of places potentially providing clues to Behrman's location. Indiana State Police Trooper James Minton investigated the list, including gravel pits off of Texas Ridge Road between Stinesville and Gosport. A route from Gosport to the intersection of Warthen and Duckworth Roads in Morgan County passes by Horseshoe Bend.

On March 9, 2003, Behrman's remains were discovered by a hunter in a wooded area near the intersection of Warthen and Duckworth Roads in Morgan County approximately thirty-five to forty yards from a clearing in the timber north of Warthen Road. Authorities recovered approximately half of the bones in Behrman's skeleton. No soft tissue remained. Six rib bones were among the bones missing from her skeleton. There was no evidence of stab or knife wounds, nor was there evidence of blunt force trauma. Investigators recovered a shotgun shell wadding[6] from the scene, as well as 380 number eight shot lead pellets. The wadding found at the scene was typical of a twelve-gauge shotgun shell wadding. The cause of Behrman's death was ruled to be a contact shotgun wound to the back of the head. Scattered skull fragments and the presence of lead pellets in a variety of places, together with certain soil stains consistent with body decomposition, suggested that after being shot, Behrman's body had come to rest and had decomposed at the spot where it was found. No clothing was found at the scene. There is nothing in the record to clarify whether Behrman's clothing, if it had been left at the scene, would or would not have completely disintegrated prior to her body being found.

In March 2003, Myers told another co-worker, who had brought a newspaper to work announcing the discovery of Behrman's remains, that the woods pictured in the newspaper article looked familiar to him, and that he had hunted there before. According to this co-worker, the woods pictured in the newspaper article did not appear distinctive. Myers also stated that it was good that Behrman had been found and that he was surprised that he had not been contacted because he knew the people who police thought had committed the crime. Myers knew Wendy Owings, who had falsely confessed to the crime, as well as Uriah Clouse and Alicia Sowders–Evans. Myers had a "cocky" tone of voice when he made these comments, according to the co-worker.

---

5. Owings testified at trial that she had confessed to Behrman's murder but that this had been a false confession.

6. The "wadding" is the plastic portion separating the pellets from the other components on the inside of the shotgun shell.

More than a year later, in November 2004, Myers called his grandmother, Swaffard. Myers, who was upset and stated that he needed time to himself, said to Swaffard, "Grandma, if you just knew the things that I've got on my mind. [I]f the authorities knew it, I'd be in prison for the rest of my life." Tr. p. 1833. Myers further stated that his father, John Myers Sr., "knew" and had "[taken] it to the grave with him." Tr. p. 1833. Subsequently, when Myers arrived at Swaffard's house, he said with tears in his eyes, "Grandma, I wish I wasn't a bad person. I wish I hadn't done these bad things." Tr. p. 1833–34.

Indiana State Police Detectives Tom Arvin and Rick Lang interviewed Myers again on May 2, 2005. During this taped interview, Myers denied having told anyone in his family that he was "scared" of the roadblocks or that he had talked to anyone besides the police about the case. Also in May of 2005, Myers, who was again in the Monroe County Jail on an unrelated charge, mentioned to his bunkmate that the state police were investigating him because Behrman's bicycle had been found in the vicinity of his house. Myers made approximately three or four references to Behrman's bicycle and was nervous and pacing at the time. During that conversation, Myers, who was also angry, made reference to the "bitch," and stated to this bunkmate, "[I]f she [referring to Behrman] wouldn't have said anything, . . . none of this would have happened." Tr. p. 2270–71.

On February 17, 2006, Detective Lang took Goodman on a thirty-six-mile drive north of Myers's home on Maple Grove Road and into rural Morgan County. Goodman recognized a clearing in the woods near the corner of Warthen and Duckworth Roads, approximately thirty-five to forty yards from where Behrman's remains were discovered, as the place that Myers had driven her in March 2000.

## II. Proceedings

A Morgan County grand jury indicted Myers for Behrman's murder on April 7, 2006. On April 19, 2006, Myers moved for a change of venue, which the trial court denied on May 22, 2006. Prior to trial, Myers filed a motion *in limine* seeking to exclude the entirety of Swaffard's testimony. The trial court denied his motion. Myers also moved to exclude certain testimony by Goodman.[7] The trial court denied the motion with respect to Goodman's account of her March 2000 drive with Myers.

During trial, which commenced on October 16, 2006, expert witness Dr. Stephen Radentz testified multiple times regarding the possibility that Behrman had been raped. Defense counsel objected only once, and not until the State's third round of examining Dr. Radentz. The trial court did not exclude the rape testimony. Also at trial, the State introduced into evidence Myers's taped interrogation. Defense counsel did not request an admonition, and the trial court did not admonish the jury as to the limited purpose of certain statements in the tape. Additionally, the trial court excluded from evidence an FBI report offered by the defense alleging the existence of other theories and suspects in Behrman's disappearance.

Defense counsel moved for a mistrial four times during the course of the trial,

---

7. The State's Supplemental and Specific 404(b) notice identifying potential testimony from Goodman was not included in the record, nor was Myers's response to said notice and second motion *in limine* purportedly seeking to exclude Goodman's testimony. This court's review is therefore confined to the trial court's recitation of the parties' motions.

once after Behrman's parents spoke to the media, which he alleged violated the court's separation-of-witnesses order; again when Detective Rick Crussen referred to a polygraph test; a third time when Detective Rick Lang suggested Myers knew specific information about the murder; and the last time after allegations emerged regarding jury misconduct. The trial court denied each motion.

Following a twelve-day trial, the jury found Myers guilty as charged. At a December 1, 2006 sentencing hearing, the trial court sentenced Myers to sixty-five years in the Department of Correction. Myers filed a motion to correct error on December 29, 2006, which the trial court denied. This appeal follows.

## DISCUSSION AND DECISION

### I. Venue

Myers's first challenge on appeal is to the trial court's denial of his motion for a change of venue. Myers moved for a change of venue on the grounds that the extensive media coverage in the case was sufficiently prejudicial such that he could not receive a fair trial in Morgan County. After a hearing, the trial court denied Myers's motion, reasoning that the media attention surrounding the case would present itself in any venue and that a sufficiently extensive *voir dire* process could ensure the empanelment of an impartial jury.

■ This court reviews a trial court's denial of a motion for change of venue for an abuse of discretion. *Ward v. State*, 810 N.E.2d 1042, 1049 (Ind.2004). An abuse of discretion does not occur where *voir dire* reveals that the seated panel was able to set aside preconceived notions of guilt and render a verdict based solely on the evidence. *Id.*

### A. Exhaustion of Peremptory Challenges

■ The Indiana Supreme Court has repeatedly held that in order to prove that an error occurred in the denial of a motion for change of venue from the county, the defendant must show that he exhausted his peremptory challenges in an effort to secure juror impartiality and also that the jury was so prejudiced against him that it was unable to render an impartial verdict in accordance with the evidence. *Bixler v. State*, 471 N.E.2d 1093, 1100 (Ind.1984), *cited in Neal v. State*, 506 N.E.2d 1116, 1123 (Ind.Ct.App.1987). As the State argues, Myers did not exhaust his peremptory challenges, using only eight of his allotted ten. By failing to make the maximum permissible effort to secure juror impartiality, Myers may not now claim that the trial court's denial of his motion for change of venue was in error.

### B. Impartial Jury

Myers's claim of error with respect to the trial court's denial of his motion for a change of venue further fails on the merits. A defendant must demonstrate the existence of two distinct elements to establish the existence of jury prejudice: (1) prejudicial pretrial publicity and (2) the inability of jurors to render an impartial verdict. *Ward*, 810 N.E.2d at 1049. "Prejudicial pretrial publicity is that which contains inflammatory material which would not be admissible at the defendant's trial or contains misstatements or distortions of the evidence given at trial." *Id.* (quotation omitted).

It is not a prerequisite to a fair trial that the jurors be totally ignorant of the facts involved. *Id.* A juror's mere exposure to press coverage is not enough to support a claim that local prejudice entitles a defendant to a change of venue. *Id.* Even if potential jurors have been exposed to pretrial publicity concerning the defendant's

case, that alone is insufficient to establish prejudice unless the defendant can also demonstrate that the jurors were unable to set aside any preconceived notions of guilt and render a verdict based on the evidence. *Id.*

In challenging the trial court's denial of his motion for a change of venue, Myers analogizes his case to *Ward.* In *Ward,* the defendant was accused of a highly publicized stabbing in Spencer County, Indiana, population 20,400. 810 N.E.2d at 1045. News articles detailed the brutality of the crime and the defendant's criminal history. *Ward,* 810 N.E.2d at 1049. During a two-day *voir dire,* during which the defendant exhausted his peremptory challenges, eighty-four of the 122 potential jurors who completed a questionnaire checked "yes" in answer to the question of whether they had formed beliefs regarding the defendant's guilt or innocence, and when asked to describe such beliefs, their answers suggested they had concluded that the defendant was likely guilty. *Id.* at 1046–47. Of the jurors selected, all but one had heard, seen, or read about the case, and six of the seated jurors were among those who had checked "yes" with respect to whether they had come to a conclusion about the defendant's guilt. *Id.* at 1047. One juror even suggested that it would be very difficult for her to change her mind regarding the defendant's guilt. *Id.* at 1050. Given this juror's stated inability to make a decision solely on the evidence, as well as the community's demonstrated hostility toward the defendant as reflected by the juror questionnaires, the Supreme Court found error in the denial of his motion for a change of venue. *Id.*

In arguing that his case is similar to *Ward,* Myers lists multiple news reports which were published following his arrest. He also refers to juror questionnaires in which statements by certain jury pool members suggested that they had independent beliefs regarding his connection to the crime charged.[8] Myers additionally points out that eleven of the fifteen empaneled jurors indicated they had heard about the case, that Juror 15 stated he believed in the "eye for eye[,] life for life" philosophy and checked both "yes" and "no" with respect to whether he had formed an opinion about Myers, and that Juror 85 indicated he would put any publicity out of his mind only "as far as humanly possible." App. pp. 4148, 4154, 4770.

■ With respect to the first prong of prejudicial pretrial publicity, the instant case is arguably similar to *Ward.* In *Ward,* the Supreme Court observed that news articles, which recounted the defendant's criminal history, contained inflammatory, inadmissible information. 810 N.E.2d at 1049. Given these news articles, the *Ward* court determined the defendant had established the existence of prejudicial pretrial publicity. *Id.* Here, news articles in the Martinsville *Reporter–Times,* Bloomington *Herald–Times,* and *Indianapolis Star,* included in Exhibit A of Myers's motion for a change of venue, similarly recounted Myers's criminal history and contained inflammatory, inadmissible information. Under the *Ward* analysis, Myers has established the element of prejudicial pretrial publicity necessary for a change of venue.

■ With respect to the second prong, however, Myers fails to demonstrate that the jurors were unable to render an impartial verdict. In contrast with *Ward,* no empaneled juror in the instant case indi-

---

**8.** It is possible to connect the statements listed in Myers's brief with only ten of the jury pool members. Myers's citations to alleged juror statements next to bullet points ten, eleven, and thirteen on page twenty-four of his brief do not correspond to such statements in the appendix.

cated uncertainty with respect to his or her ability to disregard any opinion of guilt and base a decision solely on the evidence. 810 N.E.2d at 1050. Further, although a large percentage of the jury pool in the instant case had some exposure to media coverage of the Behrman case over the years, the jury questionnaires and selection process did not demonstrate the deep and bitter hostility evident in *Ward.* While, as Myers points out, some jury pool members had opinions as to Myers's guilt or innocence, none of the empaneled jury members did.[9] Prior to *voir dire,* the trial court questioned all potential jurors as to whether they believed themselves capable of fairly and impartially listening only to the evidence presented in the case and returning a verdict based solely on the evidence presented in court. Those who indicated they could not were excused. Only eleven of the fifteen jurors ultimately empaneled indicated having heard about the case, and their expressed knowledge was limited to the facts that Behrman had disappeared and/or that Myers, or someone, was charged with her murder. In addition, all jury members confirmed that they were able to disregard any pretrial media publicity and opinions as to the defendant's guilt and that they would make a

decision based solely on the evidence at trial if instructed to do so.[10] While, as the *Ward* court noted, the presumption that the jurors' sincerity in this regard may be overcome by a general showing of prejudice throughout the community, here Myers fails to demonstrate such community-wide prejudice, as the only biased statements in the record were made by a minority of jury pool members who were never empaneled.[11] *Ward,* 810 N.E.2d at 1050. We conclude that the trial court did not abuse its discretion in denying Myers's motion for a change of venue. *See Eads v. State,* 677 N.E.2d 524, 525 (Ind.1997) (finding no abuse of discretion in denial of motion for change of venue where three seated jurors indicated they had formed an early opinion as to the defendant's guilt or innocence but two later indicated they could set aside these opinions and the third indicated after extensive questioning that he could be impartial).

## II. Denial of Motions *in Limine*

### A. Testimony of Carly Goodman

#### 1. Indiana Rules of Evidence 404(b) and 403

■ Myers next argues that the trial court erred by admitting Goodman's testi-

9. It does not appear that Juror 15 marked both "yes" and "no" on the juror questionnaire in answer to whether he had formed an opinion about the case. Instead, it appears that Juror 15 checked "yes," marked this answer out, and then checked "no." App. p. 4154.

10. With respect to Juror 15's indication that he believed in the "eye for eye" philosophy, nothing from this answer indicates a specific hostility toward Myers. App. p. 4148. Indeed, as stated above, Juror 15 indicated his ability to disregard publicity and to decide the case on the evidence. Regarding Juror 85's statement that he could put pretrial publicity out of his mind only "as far as humanly possible," it is questionable how Juror 85's recognition of his human limitations some-

how reflects a prejudice toward Myers. Indeed, Juror 85 specified that he did not pay very much attention to the news that there was an arrest in connection with Behrman's disappearance and indicated he was capable of basing his decision solely upon the evidence at trial. In addition, Myers could have exercised his two unused peremptory challenges to excuse both Juror 15 and Juror 85.

11. Myers additionally alleges that jury prejudice is further evidenced by Jury Question 84 at trial, inquiring about rape, which Myers claims could only have come from exposure to the media. In fact, witness Dr. Radentz referred to the possibility of rape during his testimony prior to Jury Question 84. Myers's argument on this point is refuted by the record and therefore without merit.

mony identifying the site where Behrman's remains were discovered as a place Myers had previously taken her. In appealing the admission of this testimony, Myers argues that the evidence was overly prejudicial, it had minimal probative value, and it "created the impression that Myers had a motive for killing Jill Behrman." Appellant's Brief p. 30.

Prior to trial, the State filed its notice of intent to offer evidence under Indiana Rule of Evidence 404(b). Myers challenged this evidence in his second motion *in limine.* The trial court denied Myers's motion to exclude testimony by Goodman that Myers had driven her in March of 2000 to a clearing in the woods where Behrman's remains were ultimately found. At trial, defense counsel did not renew his objection to Goodman's testimony regarding this March 2000 drive.

■ Defense counsel's failure to renew his challenge to the overall substance of Goodman's testimony results in waiver of this claim. The failure to make a contemporaneous objection to the admission of evidence at trial, so as to provide the trial court an opportunity to make a final ruling on the matter in the context in which the evidence is introduced, results in waiver of the error on appeal. *Brown v. State,* 783 N.E.2d 1121, 1125–26 (Ind.2003).

### 2. Impermissibly Suggestive Investigative Tactics

■ Myers additionally challenges Goodman's testimony on the basis that it resulted from impermissibly suggestive identification tactics. While the Indiana Supreme Court and this court have considered the question of impermissibly suggestive identification tactics in the context of

the identification of persons, Myers points to no Indiana precedent suggesting that this analysis similarly applies to the identification of geographical locations. In any event, we find it unnecessary to consider the merits of Myers's argument because he failed to lodge a contemporaneous objection to Goodman's testimony on this basis. Myers's claim on this point is therefore waived.[12] *See Miles v. State,* 764 N.E.2d 237, 239–40 (Ind.Ct.App.2002), *trans. denied.* Myers makes no claim of fundamental error, and, even if he had, the admission of allegedly tainted identification evidence does not constitute fundamental error. *Id.*

### 3. Use of Exhibit 1

■ Myers next claims that the trial court erred in permitting the State to use Exhibit 1 as a demonstrative exhibit during Goodman's testimony. In testifying at trial to the route Myers had driven her in the past, Goodman referred for demonstrative purposes to State's Exhibit 1, a map of Monroe and Morgan Counties, which at the time of her testimony contained markers designating the locations of Myers's residence, as well as Behrman's bicycle and her remains. Myers lodged a timely objection to this testimony at trial. The State does not respond to Myers's claim on this point.

■ The trial court has inherent discretionary power on the admission of evidence, and its decisions are reviewed only for an abuse of that discretion. *Jones v. State,* 780 N.E.2d 373, 376 (Ind.2002). Demonstrative evidence is evidence offered for purposes of illustration and clarification. *Wise v. State,* 719 N.E.2d 1192,

---

12. Myers also argues that Goodman's in-court identification of State's Exhibit 12 was similarly tainted due to the allegedly impermissibly suggestive identification tactics used by Detective Lang. Myers lodged no objection to Goodman's in-court identification of State's Exhibit 12, which also waives this claim. *See Miles,* 764 N.E.2d at 240.

1196 (Ind.1999). To be admissible, the evidence need only be sufficiently explanatory or illustrative of relevant testimony to be of potential help to the trier of fact. *Id.* The admissibility of demonstrative evidence, like all evidence, is also subject to the balancing of probative value against the danger of unfair prejudice. *Id.* (citing Ind. Evid. R. 403).

We are unpersuaded that the trial court erred in admitting Exhibit 1 as a demonstrative exhibit. Goodman testified that a map would be of assistance in testifying to her route with Myers, and she specifically testified that her route with Myers included Myers's residence, the town of Gosport, a road leading out of Gosport, a bridge, a creek, and woods. Given the importance in this case of the geographical locations at issue, we find no error in the court's permitting Goodman to reference the map in State's Exhibit 1 to assist the jury's understanding of the layout of roads and locations at issue.

With respect to the probative value of Exhibit 1 as weighed against its potential for unfair prejudice, given the importance of the jury's understanding of the geography in this case, Exhibit 1 was highly probative. Indeed, Goodman's recognition of her route with Myers, leading to a specific destination, was a crucial evidentiary link in the State's case against Myers. As for the danger of unfair prejudice, the trial court instructed Goodman, in front of the jury, to disregard the markers indicating the locations of Behrman's bicycle and her remains, and Goodman indicated that she would do so. *See Banks v. State,* 761 N.E.2d 403, 405 (Ind.2002) ("A timely and accurate admonition is presumed to cure any error in the admission of evidence.") In addition, the jury was more than capable of assessing Goodman's testimony and references to Exhibit 1 in light of these pre-existing markers.

■ Perhaps more importantly, regardless of the claimed inadmissibility of State's Exhibit 1, the central issue in this case was Goodman's recognition of the clearing where Myers had taken her, not the route they had traveled to get there. Because Goodman also testified to recognizing Exhibit 12, the clearing itself, by characteristics independent of any route indicated in Exhibit 1, we reject Myers's claim that Goodman's testimony regarding this route constituted reversible error. *See Garrison v. State,* 589 N.E.2d 1156, 1158 (Ind.1992) (observing that appellant must show substantial injury to constitute reversible error).

**B. Testimony of Betty Swaffard**

Swaffard testified at trial to the various statements Myers had made to her over the years. Myers challenges the admission of this testimony into evidence by claiming it does not qualify as a statement against penal interest under Indiana Rule of Evidence 804(b)(3).

■ Myers's claim on this basis is misplaced. Myers's statements to Swaffard fall under Indiana Rule of Evidence 801(d)(2) as statements by a party opponent, so Swaffard's testimony regarding these statements is specifically not hearsay. *See Banks v. State,* 761 N.E.2d 403, 406 (Ind.2002). ("A party's own statement offered against mat party is not hearsay.") It is therefore unnecessary to determine whether the exceptions under Indiana Rule of Evidence 804 apply.

■ To the extent Myers's challenge is to the relevance of Swaffard's testimony, the trial court has discretion to permit the admission of even marginally relevant evidence. *Larry v. State,* 716 N.E.2d 79, 81 (Ind.Ct.App.1999). Evidence is relevant if it tends to prove or disprove a material fact or sheds any light

on the guilt or innocence of the accused. *See id.* As a matter of common sense, Myers's request to borrow money immediately after his parents were questioned by authorities, and his statements that he was a suspect in Behrman's disappearance, was afraid of roadblocks, and was concerned about spending the rest of his life in prison, tend to prove the material fact of his connection to the case.

### III. Admissibility of Rape Testimony

Myers was not charged with rape. At trial, forensic pathologist Dr. Stephen Radentz nevertheless testified that the circumstances surrounding the disposal of Behrman's remains suggested the classic scenario for a rape-homicide. The court subsequently submitted Jury Question 84 without objection to Dr. Radentz, which asked in part, "Do you believe the body was raped before being shot?", to which Dr. Radentz answered, "Yes." Tr. p. 1454. During follow-up cross-examination, Dr. Radentz admitted there was no physical evidence to support such an assertion. During additional re-direct examination, however, he testified based upon his training and experience that due to the facts that Behrman's remains were found in a remote area, without clothing, and with a "depersonalizing" shotgun wound to the back of the head, Behrman's case was a "rape homicide . . . until proven otherwise." Tr. p. 1460.

Although Myers specifically challenges on appeal the court's submission of Question 84 to Dr. Radentz, defense counsel did not object to Jury Question 84, which, but for a claim of fundamental error, waives the issue. *See Ashba v. State,* 816 N.E.2d 862, 866 (Ind.Ct.App.2004) (concluding challenge to trial court's failure to ask

jurors if they had questions was waived where defense counsel joined the State's objection to the questions). Myers also claims, however, that Dr. Radentz's references to rape constituted fundamental error.[13]

Myers argues that Dr. Radentz was not qualified to offer expert testimony regarding the possibility that Behrman had been raped. Under Indiana Rule of Evidence 702, if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. Dr. Radentz, a forensic pathologist who performed Behrman's autopsy, also specializes in physical or forensic anthropology and firearm wounds. Apart from stating that Dr. Radentz was "not qualified" to give his opinion on rape, Myers does not indicate how his qualifications were specifically inadequate to testify on this topic. We therefore reject his claim that the testimony was inadmissible under Indiana Rule of Evidence 702.

Myers also points to the prejudicial nature of Dr. Radentz's rape testimony. Under Indiana Rule of Evidence 403, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. With respect to the probative value of Dr. Radentz's testimony, an essential element of rape is penetration, no matter how slight. *McCormick v. State,* 182 Ind.App. 541, 544, 395 N.E.2d 856, 858 (1979). Because none of Behrman's soft tissue remained, there was no physical evidence to support the rape determination. In addi-

---

**13.** Although Myers specifically refers to the trial court's submission of Jury Question 84 to the jury as fundamental error, his argument of fundamental error appears to encompass all of Dr. Radentz's references to rape.

tion, Myers was not charged with rape. We agree that the rape testimony was more prejudicial than probative.

■■■■ Having concluded that Dr. Radentz's rape testimony, based on this trial record, was inadmissible under Indiana Rule of Evidence 403, we must consider whether, as Myers urges, this constituted fundamental error.[14] The fundamental error exception to the waiver rule is an extremely narrow one. *Glotzbach v. State*, 783 N.E.2d 1221, 1225–26 (Ind.Ct.App. 2003). To rise to the level of fundamental error, the error must be so prejudicial to the rights of the defendant as to make a fair trial impossible. *Id.* at 1226. Specifically, the error " 'must constitute a blatant violation of basic principles, the harm or potential for harm must be substantial, and the resulting error must deny the defendant fundamental due process.' " *Id.* (quoting *Wilson v. State*, 514 N.E.2d 282, 284 (Ind.1987)). In determining whether an alleged error rendered a judicial proceeding unfair, we must consider whether the resulting harm or potential for harm is substantial. *Myers v. State*, 718 N.E.2d 783, 790 (Ind.Ct.App.1999). We look to the totality of the circumstances and decide whether the error had a substantial influence upon the outcome. *Id.*

We conclude that any error in the admission of Dr. Radentz's rape testimony did not substantially influence the outcome of the trial. The question of rape was peripheral to the murder charge and received relatively minimal attention at trial. To the extent the possibility of rape was at issue, defense counsel thoroughly cross-examined Dr. Radentz, eliciting his testimony that there was no physical evidence that Behrman had been raped and that the only basis upon which he opined that a rape had occurred was his training and experience with respect to circumstances surrounding the general disposal of human remains. Furthermore, the trial court excluded all evidence tending to link Myers to inappropriate sexual conduct. The references to rape, therefore, did nothing to implicate Myers as the perpetrator of this charged crime, which was the central issue at trial. In addition, to the extent Myers challenges Dr. Radentz's testimony on the basis that it suggests a standard contrary to his presumption of innocence, Dr. Radentz's reference to "rape homicide until proven otherwise" related to the specific issue of body disposal scenarios, not Myers's guilt, and the jury was plainly instructed that Myers was innocent until proven guilty beyond a reasonable doubt. Accordingly, we conclude that Dr. Radentz's rape testimony did not constitute fundamental error.

## IV. Failure to Include Proper Admonition

■■ Indiana State Police Detectives Rick Lang and Tom Arvin interviewed Myers on May 2, 2005, and this taped interview was admitted at trial as State's Exhibit 96B. During this interview, Detectives Lang and Arvin questioned Myers about who else was with him when "what happened to Jill" happened; they told Myers that his "out" was "whoever was with [him]"; they informed Myers that he was "looking at" the "whole thing," meaning a "murder pie"; and they indicated that Myers had confessed to John Myers Sr. that he was "there," and that John

---

**14.** The State responds to Myers's claim of fundamental error by arguing that he invited the error. While Myers did not object to Jury Question 84, he introduced no evidence which left the trier of fact with a false or misleading impression of the facts related. The State's argument on this basis is without merit. *See Crafton v. State*, 821 N.E.2d 907, 910–11 (Ind.Ct.App.2005) (finding defendant opened door by failing to object to jury question and by presenting false impression through his testimony).

Myers Sr. had recorded this confession in a letter.[15] State's Exh. 96B pp. 88, 91–92, 100.

Myers claims on appeal that the trial court erred in admitting State's Exhibit 96B without an admonition pursuant to Indiana Rule of Evidence 704(b) advising the jury to disregard statements by Detectives Lang and Arvin allegedly indicating their opinions and John Myers Sr.'s opinion of Myers's guilt. Defense counsel did not request the court to give such an admonition, nor did he object to the evidence in State's Exhibit 96B on these grounds at trial.

In support of his claim, Myers points to *Smith v. State*, 721 N.E.2d 213, 216 (Ind. 1999), wherein the Indiana Supreme Court found error in the admission of an interrogation tape containing hearsay assertions by a detective, the substance of which suggested the defendant's guilt, without an admonition to the jury, in spite of the fact that neither party had requested such an admonition. In *Smith*, however, the defendant objected to the challenged evidence at trial, and the *Smith* court's determination of error was based upon the erroneous admission of this evidence. Here, in contrast, Myers lodged no objection to the evidence at trial, and his challenge is only to the trial court's failure to admonish the jury on Rule 704 grounds. Because Myers did not object to the evidence at trial, his reliance on *Smith* is misplaced.

In failing to object to the evidence and in failing to request an admonition, Myers has waived his claim of error on this point. *See Humphrey v. State*, 680 N.E.2d 836, 839–40 (Ind.1997) (holding that failure to request an admonition waives any error

based upon its absence); *see also Washington v. State*, 808 N.E.2d 617, 625 (Ind. 2004) ("Because [the defendant] did not direct the trial court's attention to a possible Rule 704 violation, he has waived consideration of this argument on appeal."). Myers makes no claim of fundamental error.

## V. Exclusion of FBI Report

At trial, defense counsel sought to introduce a report written by former FBI Agent Gary Dunn. This report contained Dunn's conclusions based upon statements from other persons, which were also contained in the report, regarding Behrman's disappearance and death. The trial court excluded the report on the grounds that it contained hearsay within hearsay.

Myers argues that the report was admissible under Indiana Rule of Evidence 803(8), which creates a hearsay exception for investigative reports by law enforcement personnel when offered in a criminal case by the accused, and Rule 804(b)(3), which creates a hearsay exception for statements against interest. Myers also points to Defendant's Exhibit B, a police report by Detective Lang which similarly contained hearsay within hearsay, and which the trial court nevertheless admitted into evidence.

As previously mentioned, the trial court's discretion to admit or exclude evidence is broad, and this court will not reverse the trial court absent an abuse of that discretion. *Hardiman v. State*, 726 N.E.2d 1201, 1203 (Ind.2000). A trial court abuses its discretion when its evidentiary ruling is clearly against the logic, facts, and circumstances presented. *Id.*

---

**15.** After State's Exhibit 96B was played for the jury, defense counsel cross-examined Detective Lang, and Detective Lang conceded that contrary to his representations to Myers during the interrogation, there was no letter from John Myers Sr. detailing Myers's confession.

■ Myers argues that public records under Indiana Rule of Evidence 803(8) are presumed trustworthy and that the trial court erred by placing the burden of establishing the FBI report's trustworthiness on him. *See Sparkman v. State*, 722 N.E.2d 1259, 1263 (Ind.Ct.App.2000). Contrary to Myers's argument, the trial court's exclusion of the FBI report was not based upon the report's alleged lack of trustworthiness. The court instead excluded the report because it contained hearsay within hearsay, references to polygraphs, and other evidence which the court deemed inadmissible. When faced with multiple hearsay, "each part of the combined statement" must fall within a hearsay exception. *Id.* (citing Ind. Evid. R. 805). It is the burden of the party seeking to introduce such a combined statement to show that each part falls within such an exception. *See id.* Here, the police report itself qualifies under Rule 803(8) as a hearsay exception. Myers fails to show, however, that the various statements contained within that report fall within an additional exception. Specifically, Myers points to no additional hearsay exception applicable to the reported Harrell Road sighting contained in the report, which Myers seeks to introduce for its truthfulness, a classic hearsay violation.[16] Additionally, while Myers points to the statements in the report by Owings and others as admissions against penal interest, he made no showing that these declarants were unavailable, a necessary step in permitting such admissions against interest as an exception to hearsay. Myers's claim of error on this point is without merit. As a matter of fact, both Dunn and Owings were called and testified at trial, and they were subject to cross-examination by the defense as to their involvement or knowledge Behrman's disappearance and murder.

## VI. Denial of Motion for Mistrial

■ Myers additionally challenges his conviction by claiming the trial court erred in denying his motions for mistrial. The trial court is in the best position to assess the impact of a particular event upon the jury. *Anderson v. State*, 774 N.E.2d 906, 911 (Ind.Ct.App.2002). Thus, the decision of whether to grant or deny a motion for mistrial is committed to the sound discretion of the trial court and will be reversed only upon an abuse of that discretion. *Id.* The denial of a motion for mistrial will be reversed only upon a showing that the defendant was placed in a position of grave peril to which he should not have been subjected. *Id.* The declaration of a mistrial is an extreme action and is warranted only when no other action can be expected to remedy the situation. *Id.* The burden on appeal is upon the defendant to show that he was placed in grave peril by the denial of the mistrial motion. *Id.* The defendant has the additional burden to show that no other action could have remedied the perilous situation into which he was placed. *Id.*

### A. Violation of Separation–of–Witnesses Order

■ In its Final Pretrial Order, under the "Separation of Witnesses" paragraph,

---

16. Myers points out that the Harrell Road sighting was discussed earlier in the record. Although the trial court admitted Defendant's Exhibit B into evidence, in spite of the fact that it contained hearsay within hearsay, on the grounds that the substance of the internal hearsay had been independently addressed at trial, this justification does not demonstrate that the trial court erred in refusing to admit the FBI report, which similarly contained internal hearsay. In any event, although the reported Harrell Road sighting was discussed earlier in the trial, it was not discussed in the context of establishing the truth of this sighting. Indeed, Detective Tom Arvin's testimony specifically discredited the report of the Harrell Road sighting.

the trial court ordered that all potential witnesses for the State and the defendant were not to discuss "their testimony, or any facts about the case, with any other potential witnesses or media, or member of the public." App. p. 165. On October 19, 2006, following testimony, Eric and Marilyn Behrman apparently prepared a written statement and presented it to the media. There is no record of the contents of the statement. The next day defense counsel moved for a mistrial. In doing so, defense counsel argued that he had intended to recall the Behrmans as witnesses and that as his potential witnesses it was improper for them to discuss their testimony or the case with the media or public. The trial court denied the motion on the grounds that defense counsel had failed to give any reason for wishing to recall the Behrmans as witnesses, that it appeared he was using his ability to recall them as a "weapon to keep [them] out of the courtroom" and that in any event, the jury was unaffected by the statements because they had been sequestered. Tr. p. 1401.

■■■■ The primary purpose of a separation-of-witnesses order is to prevent witnesses from gaining knowledge from the testimony of other witnesses and adjusting their testimony accordingly. *Ray v. State*, 838 N.E.2d 480, 486 (Ind.Ct.App. 2005), *trans. denied*. The determination of the remedy for any violation of a separation order is wholly within the discretion of the trial court. *Jordan v. State*, 656 N.E.2d 816, 818 (Ind.1995). We will not disturb a trial court's decision on such matters absent a showing of a clear abuse of discretion. *Id.* Because there is no meaningful way to measure the harmfulness of the educational value to a witness who sits through the other witnesses' testimony before taking the stand, prejudice is presumed when a violation of a separation-of-witnesses order occurs, but this pre-

sumption can be overcome if the non-movant can show there was no prejudice. *See Hernandez v. State*, 716 N.E.2d 948, 955 (Ind.1999) (Boehm, J., dissenting), *cited in Ray*, 838 N.E.2d at 488.

We are not convinced that the presumption of prejudice standard applies in this case. Unlike in *Hernandez*, the Behrmans were not present during the testimony of any other witness. While it must be noted that the Behrmans' statement to the media was in violation of what the trial court deemed to be the "separation of witnesses" portion of its pretrial order, there is no evidence that any witness, prior to testifying, was exposed to their statement. Although the Behrmans apparently remained potential witnesses for the defense at the time, given defense counsel's failure to provide any "relevant and material reason for calling them back to Court," the trial court placed little weight on their status in this regard. Tr. p. 1401. The defense ultimately did not call the Behrmans as witnesses.

Myers has failed to demonstrate that this alleged violation placed him in a position of such grave peril that a mistrial was the necessary remedy. Myers claims that the Behrmans' statements prevented him from calling them, Brian Hollars, or Charles Douthett as witnesses on his behalf, and that they affected the testimony of future witnesses who would have seen the Behrmans' "obvious collaboration" with the prosecutor. Appellant's Br. p. 58. We are puzzled by Myers's assertion on this point because the Behrmans, Hollars, and Douthett testified and were subject to cross-examination. In addition, there is no record as to what the Behrmans said, Myers offers no explanation as to why these statements made it impossible for the defense to call certain witnesses, and he fails to identify how specific future witnesses were affected by the Behrmans'

statements. Myers has not satisfied his burden to show that the Behrmans' statements to the media placed him in a position of such peril that the trial court's denial of a mistrial based upon these statements constituted an abuse of discretion.

## B. Polygraph Reference

During testimony, Detective Rick Crussen stated, with respect to Myers, that he had "spoke[n] to him about possibly taking a polygraph examination." Tr. p. 1500. Defense counsel immediately objected, requesting that this comment be stricken from the record, and the trial court responded by admonishing the jury as follows:

> Ladies and gentlemen, this witness said something about polygraphs. I'm going to tell you right now, polygraphs are not admissible into evidence in any court of law in this state. Why? Because their trustworthiness has never been proven. It has about the level of voodoo science. Okay? So you are to disregard any mention that anybody was offered a polygraph. It doesn't matter. It's inadmissible anyway, and it proves nothing. Is that clear? Is that clear? Very well.

Tr. pp. 1503–04. Defense counsel subsequently moved for a mistrial.

In general, a reference to a polygraph examination without an agreement by both parties is inadmissible and grounds for error. *Glenn v. State,* 796 N.E.2d 322, 325 (Ind.Ct.App.2003), *trans. denied.* However, when the trial court admonishes the jury to disregard the inadmissible evidence, the prejudicial impact of the evidence may be sufficiently mitigated. *Sherwood v. State,* 702 N.E.2d 694, 698 (Ind.1998). The question of whether a defendant was so prejudiced that the admonition could not cure the error is one that must be determined by examining the facts of the particular case. *Williams v. State,* 755 N.E.2d 1128, 1132 (Ind.Ct.App.

2001), *trans. denied.* The burden is on the defendant to show that he was harmed and placed in grave peril by the denial of the mistrial motion. *Id.*

As a preliminary matter, we are struck by the facts that the polygraph reference at issue was not in the form of an accidental outburst by a lay witness, but instead was made by an experienced law enforcement officer making a statement to the jury in violation of the trial court's order granting the State's own motion *in limine* barring all polygraph references at trial, including those which would have favored Myers's case. While the trial court found that this reference was unintentional, the court also indicated it "expected better" out of a seasoned police officer. Tr. p. 1535. We too expect better, and we raise a collective eyebrow as to the involuntary nature of the polygraph reference. Indeed, this court and the Supreme Court have viewed polygraph references by experienced law enforcement officers with skepticism and have concluded that such references may warrant reversal. *See Baker v. State,* 506 N.E.2d 817, 818–19 (Ind.1987) (reversing conviction which rested solely on uncorroborated testimony of victim, where trained police officer referred to polygraph in violation of motion *in limine* ); *Houchen v. State,* 632 N.E.2d 791, 793–94 (Ind.Ct.App.1994) (finding fundamental error based upon experienced police officer's repeated references to polygraph test where case hinged on defendant's credibility).

Under the particular circumstances of the instant case, however, we conclude that Detective Crussen's polygraph reference *did not* constitute reversible error. Contrary to *Baker* and *Houchen,* Myers's conviction did not rest upon one witness's uncorroborated testimony, nor did Detective Crussen repeat the polygraph reference. The circumstances at issue instead

involved a single polygraph reference by one witness during a twelve-day trial involving fifty-five witnesses and over 2500 pages of transcript. In addition, the trial court immediately admonished the jury, telling them not only to disregard the polygraph reference but also that polygraphs "prove[d] nothing" and that their trustworthiness was on a level with "voodoo science." Tr. pp. 1503–04. Given the single reference to the polygraph, the fact that Myers's conviction rested upon the testimony of multiple witnesses rather than one, and the full admonition from the trial court, we conclude that the polygraph reference did not place Myers in grave peril and that the trial court did not err in denying his requested mistrial on this basis. *See Williams*, 755 N.E.2d at 1132–33 (affirming trial court's denial of mistrial on basis of polygraph reference where court duly admonished jury).

### C. Reference to Myers's Guilt[17]

■ During trial, the prosecutor asked Detective Lang if there was certain information in the case that only he knew, and Detective Lang answered, "Actually, there were three of us." Tr. p. 2421. When prompted for the individuals he was referring to, Detective Lang answered, "The Defendant and Tom...." Tr. p. 2421.[18] Defense counsel objected on the basis that this was an improper conclusion and moved for a mistrial. The trial court immediately admonished the jury by stating the following:

Members of the jury, you are instructed to disregard that last statement by the detective. Why? Because he is not al-

lowed, I'm not allowed, the attorneys are not allowed to present conclusions and opinions. Your job is to consider the facts and draw your own conclusions from those facts. I also told you at the beginning of the case, the Defendant is not required to explain anything or to prove his innocence at all. So anything mentioned about what the Defendant knew cannot be considered as anything but pure speculation. Do you understand?

Tr. p. 2422. When defense counsel renewed his motion for a mistrial on the combined basis of Detective Lang's statement and Detective Crussen's reference to the polygraph, the trial court made the following statement:

A mistrial is an extreme remedy, not to be used unless there are extreme circumstances from which the Court cannot correct the error immediately and do ... would not place the Defendant in grave peril. I don't really understand why in the world the State would want to go in this direction. They did. It was a mistake. But it's not to the level of extremity that I cannot immediately correct it, which I did. I immediately addressed the jury on the issue. I ... reminded them that they are the people that are the fact finders. They are the ones that draw the conclusion from the facts presented. It's improper for them to consider any conclusion of myself, the witness, or the attorneys. That's about all I can do. And ... I think the State needs to wise up a little better than this. This is really a stupid thing.

17. Although the State analyzes Myers's claim on this point as one of prosecutorial misconduct, it appears his claim is simply another challenge to the trial court's denial of a mistrial. While Myers challenges the prosecutor's actions, he does so by referring to the factors listed in *White v. State*, 257 Ind. 64, 69, 272 N.E.2d 312, 314–15 (1971).

18. There is a suggestion in the record that Detective Lang, in addition to stating that Myers had specific knowledge of the case, also turned his head and nodded at Myers while making this statement.

Tr. p. 2429–30. On appeal, Myers argues that the trial court erred in failing to grant a mistrial following this statement by Detective Lang, especially in light of the impermissible polygraph reference by Detective Crussen.

Indiana Evidence Rule 704(b) states that witnesses may not testify to "opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions." The trial court found, and we agree, that Detective Lang's statement suggesting Myers knew certain classified information without specifying the nature of that information was in violation of Rule 704(b) as a conclusory statement of Myers's guilt.

Regardless of the inadmissibility of Detective Lang's statement, however, we are unconvinced that it placed Myers in a position of grave peril sufficient to necessitate a mistrial. Generally, the trial court's admonition to the jury to disregard inadmissible evidence mitigates the prejudicial impact of such evidence. *Sherwood,* 702 N.E.2d at 698.

We recognize, as Myers points out, that in some cases an admonition is simply inadequate to cure an error, and a mistrial is the only proper remedy. In *White v. State,* 257 Ind. 64, 272 N.E.2d 312 (1971), the Indiana Supreme Court concluded that a police officer's testimony that the defendant had a pending armed robbery charge constituted reversible error, in spite of the fact that the trial court had admonished the jury to disregard this testimony. In *White,* however, the officer's *only* contribution to the trial was his inadmissible testimony regarding the defendant's pending charge, and his sole purpose in testifying was to wield this evidentiary harpoon. *See Greenlee v. State,* 655 N.E.2d 488, 490–91 (Ind.1995) (distinguishing *White,* 257 Ind. at 76, 272 N.E.2d at 319). Here, in contrast, Detective Lang was the lead detective in Behrman's death investigation. His knowledge of the case and purpose in testifying went far beyond his single objectionable statement. Detective Lang was the first officer to respond to the discovery of Behrman's remains, he observed Goodman's reaction upon nearing this scene almost three years later, and he interviewed Myers. Unlike the officer in *White,* whose sole purpose was to wield an evidentiary harpoon, Detective Lang's overall testimony was of primary significance to the State's case. In addition, we find Detective Lang's statement was not overly prejudicial to Myers in light of the overall evidence presented at trial. We therefore conclude *White* is distinguishable and that the instant case is one where an admonition can be curative.

Here, the trial court's admonition not only instructed the jury to disregard Detective Lang's statement, it also explained in detail the impropriety of these statements and why the jury should not consider them. The trial court was in a better position than this court is to gauge the effect of the statement on the jury. The court, while aware of the serious implications of the statement, did not deem it adequately injurious to declare a mistrial. *See Stephenson v. State,* 742 N.E.2d 463, 483 (Ind.2001) (finding any impropriety of State's actions at trial were *de minimus* and overcome by trial court's admonitions and instructions). Having determined that this is a case in which an admonition may be curative, and in light of the trial court's thorough admonition, we find no abuse of discretion.

### D. Jury Misconduct

Myers also alleges error in the trial court's denial of his motion for a mistrial on the grounds of jury misconduct due to the jurors' violations of rules regarding

cell phone and television use as well as their alcohol consumption.

■■■■ To warrant a new trial based on juror misconduct, the defendant must show the misconduct was gross and probably harmed him. *Majors v. State,* 773 N.E.2d 231, 235 (Ind.2002). This determination lies within the trial court's discretion. *Id.* Only when the decision is clearly against the logic and effect of the facts and circumstances will this court find an abuse of discretion. *Id.*

■■■■ With respect to the jurors' use of a cell phone and television, Myers fails to demonstrate that such rules violations harmed him. Although the record reflects that some jurors used a cell phone, it also reflects that they were monitored by court personnel during their use much in the same way they were monitored while using the permitted landline for making outside calls. With respect to the television use, there was no evidence that the jurors, one of whom had smuggled in a television and connected it to a DVD player,[19] ever connected this television to a television cable. Even if they had, the record further reflects that the cable to the room where the television was located had been blocked, and the television was relegated to playing DVDs only.

With respect to the alcohol use, Myers similarly fails to demonstrate the harm necessary to warrant a new trial. Although this court has in the past held a verdict per se invalid because jurors drank alcohol during deliberations, *see Schultz v. Valle,* 464 N.E.2d 354, 355 (Ind.Ct.App. 1984), the Supreme Court has since determined that the question is not whether alcohol touched the jurors' lips during the entire time between the judge's charge to the jury and the jury's rendering of verdicts. *See Majors,* 773 N.E.2d at 235. Rather, the focus is whether the jury was free from the influence of alcohol during actual deliberations. *Id.* (finding no error based upon lack of evidence that alcohol influenced daily deliberations in case where, on evening after third day of deliberations, one juror ordered and drank two beers, and bailiffs were allegedly "running up and down the hall filling [drink] orders.")

In the trial court's denial of Myers's motion to correct error based upon the above jury conduct, the court stated the following:

There is absolutely no evidence that the jurors consumed alcoholic beverages on October 30, 2006, prior to or at any time during deliberations....

There is absolutely no evidence that the jurors were unfocused, sleepy, impaired, inattentive or otherwise distracted during the court sessions and during deliberations during the trial. This jury asked, in total, over three hundred questions, many with multiple parts, of almost every single witness presented by the State and the Defendant during the evidentiary phase of this trial. Many of the jurors' questions to witnesses were more focused, more to the point, and probing than questions posed by the attorneys for either side of the case!

App. p. 601. (emphasis in original).

Here, as the trial court found, there is simply no evidence to support a finding that the jurors were under the influence of alcohol during their deliberations. There is no evidence to suggest that the jurors' alcohol consumption occurred during any trial proceedings, let alone deliberations,[20]

---

19. This juror was subsequently dismissed.

20. Myers argues that the jury likely deliberated prior to the end of testimony, given the trial court's failure to admonish them with

or that any such alleged use otherwise compromised Myers's right to a fair trial. The trial court was in a better position than we are to gauge the jurors' comportment at trial and their representations regarding their alcohol use and accompanying behavior. Given Myers's failure to provide this court with specific facts suggesting how the consumption of alcohol compromised the jury's deliberations or how various alleged rules violations, including the use of a cell phone and television, established jury bias, he has failed to demonstrate the grave peril necessary to require a mistrial. *See Stephenson v. State,* 864 N.E.2d 1022, 1054 (Ind.2007) (observing that to obtain a new trial based on a claim of juror misconduct, the defendant must present "specific, substantial evidence" establishing that a juror was possibly biased).

### VII. Sufficiency of the Evidence

■ Myers additionally challenges the sufficiency of the evidence to support the verdict finding him guilty of Behrman's murder. Our standard of review for sufficiency-of-the-evidence claims is well settled. We do not reweigh the evidence or judge the credibility of the witnesses. *Kien v. State,* 782 N.E.2d 398, 407 (Ind.Ct. App.2003), *trans. denied.* We consider only the evidence which supports the conviction and any reasonable inferences which the trier of fact may have drawn from the evidence. *Id.* We will affirm the conviction if there is substantial evidence of probative value from which a reasonable trier of fact could have drawn the conclusion that the defendant was guilty of the crime charged beyond a reasonable doubt. *Id.* Reasonable doubt is a doubt which arises from the evidence, the lack of evi-

dence, or a conflict in the evidence. *Id.* It is the function of the trier of fact to resolve conflicts of testimony and to determine the weight of the evidence and the credibility of the witnesses. *Jones v. State,* 701 N.E.2d 863, 867 (Ind.Ct.App. 1998).

Under Indiana Code section 35–42–1–1, a person who knowingly or intentionally kills another human being commits murder, a felony. There was no issue at trial as to whether Behrman was murdered; Myers's defense was that he was not the perpetrator. In summary, the following evidence supports Myers's conviction for Behrman's murder. Behrman disappeared in the North Maple Grove area, and her bike was found approximately one mile from Myers's residence. On the day Behrman disappeared, Myers was distraught, he was on vacation from work and had no alibi, he covered up the windows on his trailer, and he parked his car in a secluded place where it could not be seen from the road. Myers did not want people to know he was home that day. Days later, Myers stated that he feared he would be blamed for Behrman's disappearance.

Myers claimed authorities interviewed him in connection with the disappearance before they did so, and he called his grandmother and asked for $200 immediately after authorities interviewed his parents and the day before they interviewed him. Myers altered his behavior so as not to run into roadblocks, and for years following Behrman's disappearance, he often initiated discussions about the case in a variety of contexts. Myers predicted that Behrman would be found in the woods, which she was; and Myers observed that the

---

standard instructions prior to dismissal each day. The trial court was required to apprise the jury of standard instructions each day. *See* Ind.Code § 35–37–2–4(a) (2006). Its fail-

ure to do so, however, does not establish that the jury engaged in premature deliberations. In addition, the trial court did admonish the jury in its preliminary instructions.

woods where she was found were familiar to him. In fact, Myers had taken his girlfriend Goodman to those very woods, yards from where Behrman's remains were found, just months before Behrman disappeared.

Myers confessed to his grandmother that he was a bad person, had done bad things, and that he would be in prison for the rest of his life if authorities were aware of his deeds. Myers also angrily stated to a prison bunkmate that nothing would have happened to Behrman if "she," referring to Behrman, had not said anything. Tr. p. 2271.

Myers was in possession of keys to the Bloomington Hospital warehouse and therefore had access to a white van like the one seen in the North Maple Grove Road vicinity the morning of Behrman's disappearance. He also had access to a twelve-gauge shotgun, similar to the kind of weapon used to kill Behrman, which was found missing from his parents' home around the time of Behrman's disappearance.

The above evidence and all reasonable inferences therefrom, which demonstrate Myers's opportunity to kill Behrman; his proximity to the crime; his lack of an alibi; his despair on the date of her disappearance and afterward; his efforts to avoid detection; his sense of guilt; his continuing and peculiar interest in the case; his anger toward Behrman; and his familiarity with the remote site where Behrman was ultimately found, are sufficient to establish Myers's guilt for Behrman's murder beyond a reasonable doubt.

### VIII. Cumulative Error

█ Myers's final claim is that the cumulative effect of the alleged errors warrants reversal, even if no single error does. The Indiana Supreme Court has provided for the possibility that the cumulative effect of trial errors may warrant reversal. *Hubbell v. State*, 754 N.E.2d 884, 895 (Ind. 2001).

█ We acknowledge that the case against Myers was entirely circumstantial[21] and that there were certain discrete imperfections in his trial, specifically Dr. Radentz's references to rape, Detective Crussen's reference to a polygraph, and Detective Lang's reference to Myers's knowledge of the case. Upon a thorough review of the record, however, we are convinced that these imperfections, occurring over the span of a two-week trial, were more isolated than pervasive in nature, and that they did not create the cumulative effect of depriving Myers of his right to a fair trial. Both Detective Crussen's and Detective Lang's impermissible statements were countered by strict and thorough admonitions by the trial court, and Dr. Radentz's rape references, which were directed at the condition of Behrman's remains rather than the identity of the perpetrator, were thoroughly explored by defense counsel on cross-examination and demonstrated to be unconnected to any evidence specific to Behrman. As the State conceded at oral argument, Myers's trial may have been cleaner without these imperfections, but, separately or jointly, they were not sufficiently egregious to undermine our confidence in the trial proceedings leading to his conviction sufficient to constitute reversible error. A defendant is entitled to a fair trial, not a perfect one. *See Averhart v. State*, 614 N.E.2d 924, 929 (Ind.1993). John Myers II received a fair trial.

---

**21.** A conviction for murder may be based purely on circumstantial evidence. *Moore v. State*, 652 N.E.2d 53, 55 (Ind.1995).

The judgment of the trial court is affirmed.

DARDEN, J., and BARNES, J., concur.